**HOCKESSIN COMMUNITY CENTER, INC., a Delaware charitable nonstock corporation, Plaintiff,**

**v.**

**Francis SWIFT, Lillian Nichols, Christopher DiMarco, Nichole Hughes, Ken Henderson, Robert Fleming, Gerald Lucas, and Syl Woolford, Defendants.**

**C.A. No. 7789–VCL.**

Court of Chancery of Delaware.

Submitted: Oct. 3, 2012.

Decided: Oct. 5, 2012.

"J" Jackson Shrum, Archer & Greiner, P.C., Wilmington, Delaware; Attorney for Plaintiff.

Brian M. Gottesman, Michael W. McDermott, Berger Harris, LLC, Wilmington, Delaware; Attorneys for Defendants.

## OPINION

LASTER, Vice Chancellor.

Two competing factions claim to constitute the lawful board of directors of the Hockessin Community Center (respectively, the "Board" and the "Center"). Neither faction is correct. For the reasons set forth in this decision, the following individuals comprise the Board: Leslie Cammock, Christopher DiMarco, Robert Fleming, Ken Henderson, Nicole Hughes, Lois Johnson, Jerry Lucas, Gerard Mahotiere, Lillian Nichols, Francis Swift, and Syl Woolford.

## I. FACTUAL BACKGROUND

The case was tried on September 28, 2012. The testimonial and documentary record conflicted on many points. The following facts were established by a preponderance of the evidence.

### A. The Hockessin Community Center

The Center is a nonprofit social service agency exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. Since its incorporation in 1968, the Center has pursued its mission of providing services to low and moderate income families and individuals in the areas of education, recreation, social services, housing education, and counseling.

Defendants DiMarco, Nichols, and Swift joined the Board in 2009. Defendant

Hughes joined the Board in 2010. Because the Center claims that these four directors no longer serve on the Board, I will refer to them collectively as the "Disputed Directors." In May 2012, the Disputed Directors purported to fill vacancies on the Board with defendants Fleming, Henderson, Lucas, and Woolford.

Non-party Cammock joined the Board in 1998 and was reelected in 2002. At trial, he testified that he had been a Board member since 1992, but his service prior to 1998 appears to have been on an advisory committee. He has held the position of President of the Board continuously since 1999.

Non-party Roslyn Smith has worked at the Center for over thirty years. She has been the Executive Director since 1999. By virtue of her position, she has operational control over the Center. She is allied with the Board faction led by Cammock.

Non-parties Johnson and Mahotiere are directors whose status the Center does not challenge.

## B. The Legacy Of Hockessin School No. 107C

The Center owns approximately five-and-a-half acres of land located at 4266 Millcreek Road in Hockessin, Delaware. A building on the property formerly housed Hockessin School No. 107C, a school maintained for non-whites during the shameful era of racial segregation. In 1952, civil rights advocate Louis L. Redding won a landmark victory by successfully challenging segregation in Delaware's public schools. *See Belton v. Gebhart,* 87 A.2d 862 (Del.Ch.1952). In one of two consolidated cases litigated in *Belton,* Redding sued on behalf of Barbara Beulah to invalidate the whites-only admission policy at Hockessin School No. 29, which forced

Beulah to attend elementary school at Hockessin School No. 107C.

In *Belton,* Chancellor Seitz rejected the idea that segregated education ever could pass muster under the Equal Protection Clause, but he considered himself bound by the doctrine of "separate but equal" from *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). *See Belton,* 87 A.2d at 865. Chancellor Seitz therefore considered in detail whether the separate Delaware educational facilities challenged in the case in fact provided equal educational opportunities. *Id.* at 870–71. After thoroughly examining the numerous and dramatic ways in which the whites-only schools were superior to their non-white counterparts, Chancellor Seitz held that the separate facilities violated the Equal Protection Clause, and he issued an injunction barring the school districts from denying students admission on account of their race. *Id.* at 871. The Delaware Supreme Court affirmed. *Gebhart v. Belton,* 91 A.2d 137 (Del.1952).

In *Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), the United States Supreme Court granted writs of certiorari to review *Belton* and other decisions involving segregated schools. Only *Belton* was affirmed. *Brown v. Bd. of Educ.,* 349 U.S. 294, 301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). It has been said that *Belton* "is the Court of Chancery's proudest accomplishment." William H. Rehnquist, *The Prominence of the Delaware Court of Chancery in the State–Federal Joint Venture of Providing Justice,* 48 Bus. Law. 351, 353 (1992) (internal quotation marks omitted). Far greater credit goes to Redding, his fellow civil rights advocates, and Delaware's African–American community. The building that formerly housed Hockessin School No. 107 (the "School Building") stands as a monument to their victory.

## C. The Center Faces A Financial Crisis.

In 2007, the Center embarked on a renovation and expansion of the School Building. Petrucon Construction, Inc. ("Petrucon") was hired as the general contractor. For reasons that are heavily disputed, Petrucon stopped work in July 2009. According to Petrucon, the Center had not timely paid $58,252.46 for site work and $200,853.65 for construction.

In January 2010, Petrucon filed suit in Delaware Superior Court. In July 2011, just before trial, Petrucon and the Center settled. The Center stipulated to entry of judgment in the amount of $184,846.21, with pre-judgment interest in the amount of $22,181.55 and post-judgment interest accruing at $30.38 per day until payment. Petrucon agreed to forebear from enforcing the judgment until November 1, 2011. The Center planned to use the forbearance period to raise the funds needed to satisfy the judgment.

## D. Martin Hunt Sees An Opportunity.

During the ensuing year, the Center failed to satisfy the Petrucon judgment. In the fall of 2011, the Wilmington News Journal ran an article describing the judgment and the Center's plight. The article caught the attention of Martin Hunt, a Delaware native who, after business school, worked "as a consultant . . . doing mergers and acquisitions." Tr. 114. For the last 13 years, Hunt has lived in Hockessin.

Hunt demonstrated at trial that he has the gift of gab. He is a charismatic fellow who I am convinced can make a killer sales pitch and inspire his associates or employees. On cross examination, however, he revealed a more casual and intermittent commitment to accurate factual details. On numerous occasions, his testimony conflicted with the documentary evidence or with more credible testimony from other witnesses.

Hunt currently styles himself as Chairman and Managing Member of HWI Partners, Inc., a firm he founded in 2005. At first glance, HWI Partners appears to be a small venture capital or private equity fund. In actuality, HWI Partners does not have committed capital, nor does it actively manage a portfolio of investments. It is simply a shell entity operated by Hunt to source deals. After identifying a potential deal, Hunt offers it to the many contacts he has developed over the years, and they in turn decide whether to invest or not. Each deal becomes a coalition of the willing, structured through a separate investment vehicle with no apparent ongoing connection to HWI Partners. Hunt claims that HWI Partners has engaged in approximately a dozen transactions, but unlike proud money managers who eagerly trumpet their successes and track record, references to HWI Partner's investments are notably absent from its website.

In early September 2011, Hunt contacted the Center and offered to spend "three days" looking at their situation to see if he could come up with "an option that's better than any other option you have." Tr. 116. Hunt quickly sized up the Center as a distressed entity with two significant assets: over five acres in downtown Hockessin (no longer an oxymoron) and the School Building with its compelling connection to *Brown v. Board of Education*. The former could be subdivided and partially developed; the latter could provide the cornerstone for a major nonprofit center with a museum, library, and other related historical projects. With his connections to wealthy individuals who could easily "throw in a nickel" to save the Center, Hunt foresaw fundraising as a trip down Easy Street. Tr. 148. Hunt explained that he had "seen a great deal

of money gathered for causes a whole lot worse than this." Tr. 118.

At bottom, Hunt sensed an opportunity to do good while at the same time doing well. I do not discount that Hunt was motivated at least in part by altruism, particularly at the outset. But his was a capitalistic altruism that sought a "win-win" for himself and the Center. And if he won a little more by dint of aggressive negotiating, greater sophistication, and the Center's financial distress, then so be it.

On September 5, 2011, Hunt provided Smith with a Volunteer Confidentiality Agreement. JX 11 (the "Confidentiality Agreement"). It was a lengthy document clearly cribbed from an M & A deal. Hunt described it as HWI Partners' standard form.

The Confidentiality Agreement defined "Martin Hunt and a 'white knight' investor group" as the "Volunteer." *Id.* at 1. It obligated the Center to keep confidential *the Volunteer's information. Id.* This concept was defined expansively as

> without limitation, information regarding the Volunteer's actual or proposed businesses; historical and projected financial information, budgets, services, products, trade secrets, techniques, processes, operations, formulae, product specifications, know-how, compositions, inventions, discoveries, designs, sketches, drawings, samples, formats, marketing and manufacturing plans and materials, analyses, strategies, forecasts, research and development; concepts, ideas, names, addresses and any other characteristics, identifying information or aspects of the Volunteer's existing or potential customers, employees, vendors or suppliers, or any information derived, summarized or extracted from any of the foregoing.

*Id.* The confidentiality obligations were not reciprocal. In other words, even though

Hunt would be receiving information from the Center, it was Hunt, and not the Center, who obtained protection. The Confidentiality Agreement also provided that the Center

> will keep strictly confidential and will not, without the prior written consent of Volunteer, disclose to any third party (other than to its Representatives or as may be required by law, rule or regulation, by any governmental agency or other regulatory authority or in connection with any legal proceedings) the existence or any aspect of any ongoing negotiations, discussions or business dealings between the Volunteer and Recipient.

*Id.* at 1. Absent the earlier completion of a transaction or termination by consent, the Center's obligations lasted two years.

Smith executed the Confidentiality Agreement the same day she received it. Although she may have consulted with Cammock, she did not circulate the document to the full Board. The Disputed Directors did not see the Confidentiality Agreement until this litigation.

### E. The Letter Of Intent

On September 7, 2011, Hunt caused HWI Partners to make a proposal. *See* JX 9 (the "Letter of Intent"). In the Letter of Intent, HWI Partners offered as the representative of an unidentified "Investor Group" to "acquire a portion of the assets of the [Center] for $210,000.00 in cash paid to extinguish all liens put on [the Center's] assets and other outstanding debts." *Id.* at 1. The "portion of the assets" was defined later in the document as "3,000 square feet of [the Center's] building which shall be inclusive of the entire historic school house asset, a separate office and one acre." *Id.* at 2. The Center would be obligated to pay an undefined "monthly

mandatory fee escalating on a pro-rata basis with revenue growth until the amount borrowed is repaid or an agreed upon time period" and would be required to "maintain a net income greater than $0.00." *Id.* The loan would be secured by all of the Center's assets, including all of its real property. *Id.*

The Letter of Intent expressly treated the potential transaction as a money-making opportunity for HWI Partners. At trial, Hunt denied that he viewed a transaction with the Center as an interesting investment opportunity that could also offer advantageous accounting and tax treatment for HWI Partners. Tr. 172. But the opening paragraph of the Letter of Intent stated: "Based on our review thus far, we believe that [the Center] represents an interesting investment opportunity." JX 9 at 1. The same paragraph stated that HWI Partners and the Center would structure a transaction "to secure the most advantageous tax and accounting treatment for HWI." *Id.*

Multiple provisions of the Letter of Intent undermined Hunt's purportedly charitable motives. The document called for the Center to reimburse HWI Partners "for its reasonable out of pocket costs and expenses incurred in due diligence and for legal and other similar cost [sic] incurred in drafting the documentation and for closing the financing contemplated herein" with the amounts "payable at the closing of the transactions contemplated." *Id.* at 3. Yet the loan amount of $210,000 contemplated by the Letter of Intent did not provide any capacity for paying these expenses. The Letter of Intent also called for HWI Partners to receive a breakup fee of $75,000—*over one third of the loan val-*

*ue*—if HWI Partners was ready, willing, and able to close and the Center declined to proceed. *Id.* at 3. The Letter of Intent established a 90–day exclusive negotiating period during which time the Center was bound by a strict no-shop clause without any fiduciary out. *Id.* On top of that, the Letter of Intent imposed an expansive and open-ended confidentiality obligation on the Center that barred any disclosure about the potential transaction without HWI Partners' consent. The Center was bound "unless [it had] been advised in writing by [its] counsel that such disclosure is required by law *and* with HWI's written permission." *Id.* at 5 (emphasis added). These overly (indeed egregiously) aggressive provisions evidence an acquirer who wanted to take maximum advantage of a distressed seller and foreclose any competition that might jeopardize his leverage in the deal.

Although the Letter of Intent contains contradictory language on this point, the stronger reading is that the Letter of Intent was just that—a non-binding agreement under which HWI Partners and the Center had no obligation to proceed with a specific transaction on particular economic terms. Paragraphs 2 and 8 of the Letter of Intent described the document as a "proposal" and an "expression of interest." *Id.* at 2, 6. Paragraph 8 also stated that, except for the provisions governing the break-up fee, exclusivity, the non-solicitation provision, and the confidentiality provision, "this is a letter of intent only and does not constitute a legally binding commitment of the parties hereto and is subject in all respects to execution of a definitive agreement with respect to the matters disclosed herein."[1] *Id.* at 6. Subject to

---

1. Read literally, paragraph 8 states that the letter is binding, except for Sections 5–8, while simultaneously saying that it is not binding, except for Sections 5–8. The actual language reads: "Other than Sections 5, 6 and 7 above and this section 8, this letter, together with all attachments is binding on the parties, [sic] this is a letter of intent only

numerous conditions, including due diligence, the Letter of Intent contemplated a closing by October 20, 2011.

### F. The Hockessin Historical Society Makes A Proposal.

Hunt gave the Center just four days to accept or reject his proposal. During a telephonic meeting on September 11, Hunt's deadline, the Board declined to proceed. In the interim, the Hockessin Historical Society had expressed interest in helping the Center. The Board had questions about Hunt and wanted to meet with the Historical Society. Representatives of the Center scheduled a meeting with the Historical Society for September 14.

After Smith told Hunt about the Board's decision, Hunt extended his deadline until September 15. He emailed Smith a copy of the Confidentiality Agreement and asked her to "ensure that all Board members are aware of the attached [nondisclosure agreement] with HWI as they engage the Historical Society on Wednesday to avoid any misunderstandings." JX 38.

At the September 14 meeting, the Historical Society proposed to pay off the Petrucon judgment in return for title to the Center's real estate, including the School Building. The Historical Society offered to raise funds to complete the renovation and expansion of the School Building and then to allow the Center to move back into the facility. The Historical Society also indicated that the Center would be permitted to repurchase its real estate and the School Building by paying back the Historical Society.

### G. The Board Chooses HWI Partners Over The Historical Society.

On September 15, 2011, the Board held an "emergency meeting to review the two options on the table." JX 11. The first option was the Letter of Intent from HWI Partners. The second was the proposal from the Historical Society. The seven individuals who everyone believed at the time were directors participated in the meeting: Cammock, DiMarco, Hughes, Johnson, Mahotiere, Nichols, and Swift. Hughes participated by phone; the others were present in person. Theodore R. Nix, Jr. acted as principal counsel for the Center.

According to the minutes,

Attorney Nix stated that he has reviewed both contracts in detail and has spoken in length [sic] to one of the parties. He distributed a copy of each contract and a comparison analysis to the

---

and does not constitute a legally binding commitment." *Id.* at 5. Other language in the Letter of Intent is equally poorly drafted or legally dubious. For example, Paragraph 1 purported to elevate HWI Partners' lien on the Center's property over all other "liens, loans, commitments, or promises," which supposedly would "not apply in any way to HWI or the Investor Group." *Id.* at 2. Paragraph 3 conditioned the commencement of due diligence on the completion of due diligence and the satisfaction of conditions *to closing:* "Subject to the timely receipt and satisfactory evaluation of the requested due diligence information and to the satisfaction by [the Center] of the conditions to closing, HWI is prepared to begin due diligence." *Id.*

A garbled sentence in paragraph 7 attempts both to extend the Confidentiality Agreement and create an independent confidentiality obligation: "we ask and you agree that you and your representatives (including, without limitation, financial advisors, attorneys and accountants) will not disclose to any party the contents of HWI and the Organization agree [sic] to extend the existing confidentiality agreement between them to cover this letter or the fact that HWI, or any of its affiliates, may be considering an investment in the Organization." *Id.* at 5. At trial, Hunt claimed that lawyers prepared the document, but he could not remember which of his many attorneys worked on it. Tr. 169.

Board Members physically present in the room.

Attorney Nix stated the fact that HWI has made two (2) presentations to the Board and that a few of the Board Members have met with the group at [the Historical Society]. He acknowledged that the two (2) options were very different.... Attorney Nix advised that [the comparison] was completed by the [Center] Staff.

Attorney Nix began the review of the comparison sheet.... Attorney Nix informed the group that he received an email from Martin Hunt last night advising that he would match the [Historical Society] offer on the table, plus give [the Center] $10,000.

*Id.* at 1. In addition to Hunt's offer of an incremental $10,000, the critical differences between the alternatives were (i) the Historical Society's proposal to acquire all of the Center's real property versus the HWI Partners proposal to acquire the School Building, a nearby building, and one acre, and (ii) the Historical Society's proposal to give the Center a repurchase option.

After discussion and a short recess, Nix recommended the HWI Partners proposal as the superior offer. The directors voted 5 to 2 in favor of the HWI Partners proposal, with Swift and Hughes voting for the Historical Society proposal. Nix erroneously advised that Hughes' vote could not be counted because she was participating by telephone, which Nix incorrectly deemed to be a vote by proxy. *See* 8 *Del. C.* § 141(i) (providing that telephonic participation shall constitute presence in person at the meeting). The minutes recorded the vote as 5 to 1 in favor of the HWI Partners proposal. Nix suggested the Board advise the Historical Society that their proposal had not been accepted. He cautioned the directors not to say anything

else about the decision: "No newspapers. No radio. No [t]elevision. No loose lips. Notification to the public will have to wait until the deal is done. It should take approximately 45 days." JX 11 at 3.

## H. HWI Partners Fails To Move Forward.

Unfortunately for the Center, HWI Partners declined to proceed. According to Hunt, due diligence revealed more serious problems with the School Building than he had anticipated. No definitive documentation was prepared. No money changed hands. On November 1, 2011, Petrucon's counsel commenced foreclosure proceedings. The Center's property was scheduled to be sold at Sheriff's sale on January 10, 2012.

With no solution in sight and the sale rapidly approaching, a group of concerned citizens coalesced around Leonard L. Williams, Delaware's second African–American judge, a mentee and later law partner of Redding, and a member of the legal team that litigated *Belton*. Calling themselves the Friends of the Hockessin Colored School # 107 (the "Friends Group"), they hoped to save the School Building.

At the request of the Friends Group, the African–American Empowerment Fund of Delaware announced a matching loan for the Center of up to $100,000. The Friends Group also contacted Petrucon and asked them to forebear for 90 days. On January 9, the day before the Sheriff's sale, Petrucon agreed.

## I. The January Amendment

With the Friends Group on the scene and the School Building saved from foreclosure, Hunt reengaged with the Center. He first sought to solidify his position by providing Cammock and Smith with a proposed First Amendment to the Letter of

Intent dated January 16, 2012. JX 10 (the "January Amendment"). Among other things, the January Amendment extended the term of the Letter of Intent and provided for an anticipated closing by March 31, 2012. *Id.* at 1. More critically, it converted the Letter of Intent from a non-binding expression of interest into a binding agreement to use "best efforts" to complete the proposed transaction. *See id.* at 2 ("Your acceptance of this First Amendment . . . constitutes your agreement to execute a definitive purchase agreement . . . undertaking your best efforts to meet the general terms and conditions of the Transaction as defined in the [Letter of Intent] and this First Amendment.").[2]

Cammock and Smith executed the January Amendment the same day they received it. The document was never provided to the full Board. The Disputed Directors first saw it during this litigation.

## J. Hunt Negotiates With The Friends Group.

Hunt next reached out to Williams, the Chair of the Friends Group, and Tony Allen, its President. He told them that he had been authorized by the Board to act as the Center's exclusive representative and negotiate a transaction. *See* JX 57 at 3 ("According to Ms. Smith, Mr. Hunt and [Mr. Cammock], the [Center's] board has given Ms. Smith and Mr. Hunt the exclusive authority to talk with [the Friends Group.]"). What Hunt actually did was negotiate for himself.

The Friends Group proposed to purchase and satisfy the lien in return for title to the Center's property. Hunt countered that the Center should be allowed to retain 2,500 square feet in the School Building and two acres of land, or if title were transferred, to rent it for $1 per year in perpetuity. This would have kept the property in play for HWI Partners. For the Friends Group, it was a non-starter. As Allen explained,

the [Friends Group] would already be taking on $213,000 [in] debt on a building that has been gutted and has been completely uninhabitable for the last three years. Estimates to restore it to its original form and in compliance with state and federal historic standards range from $750,000 to more than $1 million. Those construction costs do not include ongoing operating expenses, which the [Friends Group] or another body would be required to assume. It is unacceptable to the [Friends Group] and current and prospective donors to begin this venture knowing that, once the construction is complete and the building is ready to be occupied, we would have a "rent-free tenant for life" occupying 2,500 square feet—approximately one-third of the facility—with no other pre-established streams of income.

JX 57 at 4.

The Friends Group also proposed that a new organization be formed to own and operate the building, with the Center re-

2. Like the Letter of Intent, the January Amendment evidences sloppy drafting. Read literally, paragraph 2 of the succinct, two-page agreement provides that any action or proceeding arising out of the agreement "may be brought in the courts of Delaware and each of the parties consents to the jurisdiction of such courts," while stating in the last sentence of the same paragraph that "[t]o the greatest extent consistent with applicable law, any and all disputes between the Company and the Recipient [an undefined term] are to be submitted for final and binding arbitration to the offices of JAMS, Inc. in Philadelphia, Pennsylvania." JX 10 at 1–2. Despite negotiating and signing the amendment, Hunt could not explain at trial how the dispute resolution provision worked. Tr. 195.

ceiving two seats on the new organization's Board. Hunt countered that the new organization should have a five-person board with two seats reserved for the Center, two presumptively for the Friends Group, and one for a representative of "another Hockessin-based nonprofit dedicated to the preservation of Hockessin and Delaware history." *Id.* Unbeknownst to the Friends Group at the time, Hunt was forming the Hockessin Historical Foundation (the "Foundation"), a tax-exempt entity that he planned to use for fundraising and to complete his transaction with the Center. The Friends Group found Hunt's counteroffer "unacceptable." *Id.*

By letter dated March 12, 2012, Allen formally advised Cammock that the Friends Group would no longer meet with Center representatives who were not members of the Board. In other words, they would no longer deal with Hunt. When Cammock tried to insist on having Hunt continue the discussions, Allen reiterated the Friends Group's position.

### K. The April Agreement

On March 29, 2012, the Friends Group met its fundraising goal and acquired the Petrucon judgment. To protect his position, Hunt again sought to strengthen his contractual rights with the Center. On April 5, 2012, Hunt, Cammock, and Smith executed a document titled "Hockessin Community Center Agreement." JX 13 (the "April Agreement").

The recitals to the April Agreement state that the Center "hereby partners with HWI and its nonprofit dedicated to Hockessin history, the Hockessin Heritage Foundation, Inc." *Id.* at 1. At trial, Hunt claimed that HWI Partners was not "affiliated" with the Foundation. Tr. 196. Hunt is the Managing Member of HWI Partners and serves as the leader of the Foundation, and he could only name one

other individual on the Foundation's board: his wife. Presumably, Hunt's definition of "affiliate" does not include entities under common control. *But see, e.g.,* 12 *Del. C.* § 3312 (defining "Affiliate" as "any corporation or other entity that directly or indirectly through 1 or more intermediaries controls, is controlled by or is under common control with the fiduciary"). Hunt could not recall the individuals who were listed on the Foundation's application to the IRS for tax-exempt status. He testified that he had offered membership on the Foundation's board to "[m]ost of [his] Facebook friends." Tr. 200.

The April Agreement called for HWI Partners and the Foundation to receive the School Building and a significant chunk of the Center's real property *for no cash consideration whatsoever.* In paragraph 2, the Center agreed to

> donate to HWI or its designees all rights to the title to the [School Building] after it is separated and subdivided from the new addition and all land, except for land used under the [School Building], required by applicable law or mutually agreed upon prior to June 1, 2012. HWI expects its designee for the historic school house to be the [Friends Group], if negotiations can be completed within 30 days. HWI or its designees shall decide how the building will be separated and arrange for implementation.

JX 13 at 1. In the April Agreement, the Center represented that there were "no outstanding liens, debts, obligations or encumbrances" on its property. *Id.* at 2. At the time, Hunt believed that the Friends Group had paid the Petrucon judgment and extinguished the lien, rather than paying Petrucon to acquire the judgment and lien. Because Hunt thought he had convinced the Friends Group to act naively, he believed HWI Partners stood to gain title

to the School Building, with no obligation to transfer the property to anyone.

Carving out the School Building left the Center's remaining property. In paragraph 1, the Center agreed to transfer to the Foundation

> 25% of [the Center's] remaining property (approximately 1,000 square feet), to be chosen by [the Foundation], in exchange for fees and costs already incurred by [the Center][3] pursuant to the HWI Agreement accrued up and until March 20, 2012, which have been acknowledged by [the Center] to be well over $75,000 for due diligence and over $218,000 in professional fee value.... Professional fees and expenses from March 20, 2012 through execution of this Agreement shall continue to accrue, but are not to exceed $25,000.00 plus pass through expenses.

*Id.* Put differently, in return for non-cash consideration consisting of the expenses Hunt and HWI Partners purportedly had incurred or would incur, the Center agreed to transfer "25% of [the Center's] remaining property" to the Foundation. At trial, Hunt admitted that he never provided the Center with support for $318,000 in fees and expenses. Assuming a blended hourly rate of $300 per hour, Hunt was representing that a team of professionals (whom none of the other witnesses seemingly saw) expended approximately 1,060 hours on the project—the equivalent of 132.5 eight-hour workdays.

Most pertinent to the current dispute, the April Agreement granted the Founda-

tion the right to force the Center's directors to resign and gave HWI Partners the right to appoint a new board "in its sole discretion." JX 13 at 1. Paragraph 3 stated:

> [The Foundation] will make best faith efforts [sic] to raise funds to assist in the [Center] gaining occupancy, as soon as possible, and complete the construction. If required by funding partners, the entire [Center] Board may be required resign [sic]. In that case, Board Chairman, Leslie Cammock, shall remain for a transitional period until HWI, at its sole discretion, designates a new reconstituted board, pursuant to [sic] the appropriate D & O insurance and indemnifications [sic] being put in place within two months from the execution of this agreement. Former [Center] Board members may participate in an Advisory Committee which will confidentially advise the reconstituted Board of [D]irectors at the sole discretion of the Board Chairman. If the [Center] does not break even financially ($0.00 of net income) or there is a proposed or actual staffing agreement change in the Executive Director position or the Chairmanship with prior authorization by HWI, HWI shall have the right to immediately replace a majority of the Board seats and obtain appropriate financing to sustain the [Center's] operations.

*Id.* at 1–2. The April Agreement did not explain what was meant by the phrase, "[i]f required by funding partners," or how it triggered the Board replacement right.[4]

---

3. The reference to the Center that appears here was undoubtedly a drafting error. HWI Partners was incurring due diligence expenses in contemplation of the proposed transaction, not the Center. The author simply inserted the wrong acronym, mistakenly substituting "HCC" for "HWI."

4. As with Hunt's other legal documents, the April Agreement contains numerous vagaries, oddities, and contradictions. Even the signature lines are strange. Cammock purported to sign for the Center's Board of Directors, yet Smith then purported to sign for the Center itself, as if the Center and the Board were separate entities. Hunt signed for HWI Partners. No one signed for the Foundation, even

Despite these alarming deal tactics, Cammock and Smith executed the April Agreement the same day they received it. Curiously, neither the Board President nor the Executive Director thought to circulate the document to the full Board. The Disputed Directors first saw it during this litigation.

## L. Hunt Enlists Cammock To Seek The Disputed Directors' Resignations.

In an effort to restart negotiations with the Friends Group, Hunt arranged for Cammock and Swift to accompany him to a meeting with Williams and Allen on April 13, 2012. During the meeting, Hunt claimed to have the deal described in the April Agreement between HWI Partners, the Foundation, and the Center. Swift told the Friends Group that he had no idea what Hunt was talking about. Hunt became angry and left.

Soon after the meeting, Hunt emailed Swift a copy of the Letter of Intent with its non-solicitation and confidentiality provisions. Hunt's email stated: "Please review the attached document, as a reminder of potential conflicts of interest and consequences." JX 17. Swift responded:

> Since the agreement that was agreed upon in September 2011 was not fulfilled, since no funding was accomplished, in 2011 by HWI, I believe that contract is now null and void. Currently I believe there is a truthfulness issue when you keep referring to the approval of the full Board of Directors on your negotiations with the [Friends Group]. In those negotiations you have stipulated that you are representing the Board of Directors of the [Center].

Thus I believe you are now working for the [Center] and not HWI. I heard a lot of rhetoric at our meeting with the [Friends Group] and I now believe the reputation of the [Center] is seriously at stake. My issue with everything is the survival of the Hockessin [S]chool # 107 and [the Center] as it once was. The funding and donations for the [Center] has [sic] not materialized except for what the Friends have submitted.... I believe when the [Center] again meets with the [Friends Group], that as many of the [Center] Board members also attend.

*Id.* Hunt answered with another threat: "Confidentiality is for two years. You will be held accountable for all breaches. You may want to have the [Center] notify your D & O carrier as required." *Id.*

Undeterred, Swift wrote the full Board on April 18, 2012:

> We need to have a formal Board meeting in reference to the Memorandum of Understanding that was presented to Martin Hunt and Rosylyn [sic] by [the Friends Group] who bought the lien that was held by Petrocon [sic]. An MOU was presented to representatives of [the Center] and in turn was supposed to be presented to the Board of Directors. I have not seen this MOU.
>
> Martin Hunt has presented himself as a representative of the [Center's] Board of Directors and the [the Friends Group] have now requested not to communicate with him unless an actual Board member is present. President Leslie Cammock and I attended the last meeting but more of us must attend these meetings. We also need to be brought up to date by Rosyln and Martin on the nego-

though the Foundation purportedly took on a "best faith [sic] efforts" obligation in paragraph 3. Candidly, the April Agreement does not look like a document that a lawyer draft-

ed. Hunt again failed to identify which of his many lawyers supposedly prepared the document. Tr. 213.

tiations that have been done in [sic] our behalf.

JX 36.

Rather than calling a Board meeting, Cammock called for the Board members' resignations. In an email dated April 20, 2012, Cammock stated:

> As you were previously informed, the transaction with HWI through the Hockessin Heritage Foundation is complete and the former board is invited to be part of an advisory board consulting on the future of [the Center].
>
> We request that each of you respond with an affirmative indicating [sic] to continue as an advisory board member going forward and volunteer for our May 5, 2012 fund raiser [sic] at the Woodside Creamery in Hockessin, if you have not already done so (see press releases).
>
> Members of the former building committee will not be included, at this time, because of their recommendations around stipulating to improper Petucon [sic] building expenses and other building issues. This has put the [Center] at risk due to the expiration of the D & O insurance.
>
> The formation of the advisory committee and the reconstitution of a new board of both funders and some advisory board members will rectify both issues and is well underway.
>
> If you have any questions, please call me no later than Wednesday, so that either I or [the Center's] counsel will be able to answer your questions.
>
> As a reminder, the confidentiality agreement is in place for 2 years as agreed from the date of execution.
>
> Leslie, Board President

JX 1.

This email was incorrect in a number of material respects. Except for Cammock, none of the directors had been "previously informed" about the transaction "with HWI through the Hockessin Heritage Foundation." Other than Cammock, none of the directors had seen the January Amendment or the April Agreement, and none knew of Hunt's effort to substitute the Foundation for HWI Partners. Nor was there a "transaction" that was "complete." No closing had occurred. No funds or property had changed hands. All that happened was the dubious execution of the April Agreement. Moreover, "the reconstitution of a new board" was not "well underway." The April 20 email was Hunt, Cammock, and Smith's first step in that effort.

On April 25, 2012, Smith followed up on Cammock's email by sending a "Reminder to Respond." It stated:

> Good afternoon;
>
> Just a reminder to those of you that have not yet responded to this email that was sent on Friday, April 20, 2012 and again today, please to [sic] do so by the close of business today.

JX 3. The April 25 email then repeated the text of the April 20 email.

Not surprisingly, the directors answered Cammock's and Smith's incorrect and misleading emails with conditional and ambiguous responses. Hughes wrote,

> [T]his email is a little confusing but if I am reading it correctly you are looking at establishing a new board/advisory committee? If that is the case, I will be unable to assist and my apologies for that. I am working until [sic] about 55–60 hours and just don't have time to commit to be of much assistance. I simply don't have the time to really be helpful.

JX 2. Hughes' email was not, in fact, a resignation from the Center's Board. At trial, Hughes testified that she did not

intend to resign. She rather declined to join a new board or advisory committee.

Nichols responded by disputing her knowledge of the purported transaction and expressing her intent to submit a formal recommendation in writing. Her email stated:

> I'd like to thank you for the opportunity to serve on your board; however having not been apart [sic] of the final transaction with the funding organizations to save [the Center] and being ill informed about its future, I will be tendering my resignation. Unfortunately, I have commitments on May 5th that will take me out of the area. I will formally submit my resignation in writing. I still believe in the work that [the Center] performs and wish it ardent success in its future endeavors.

JX 4. Read literally, Nichols stated that she would "formally submit [her] resignation in writing" at a future date. At trial, Nichols testified that she did not intend to resign via email but rather planned to send a written resignation in the future, which she never did.

Swift responded on April 23 by disputing whether the HWI Partners transaction had closed:

> If the HWI bid was completed, then how come they did not pay off the lean [sic] and the historuic [sic] property turned over to them.... Since I have been kept in the dark and not part of any of your meetings with HWI except for the most previous one and you have not considered any of my suggestions for financial stability. [sic] I will be reisigning [sic] my position in writing as member [sic] of this Board. This will become effective April 30, 2012.

JX 55, Ex. A. Cammock wrote back saying "[y]our resignation was accepted by the new board upon receipt." *Id.*

Like Nichols, Swift literally stated that he would be resigning in the future by submitting a writing that would have an effective date of April 30. On April 30, Swift emailed Cammock that he had "decided not to send in [his] resignation" until after he had talked with his fellow directors. JX 56, Ex. A. at 1. Swift later told Cammock that "after talking with the Board [he] had decided to stay on." *Id.* at 4.

DiMarco was the clearest in his response. Like Hughes, he thought that he was being asked to serve on a new advisory committee, and he responded "for the record, that [he] would not be interested in serving on the new committee." JX 62. He asked for an explanation of "how these decisions were reached without the knowledge, consent or authority of the current [Board] of the [Center]?" *Id.*

## M. Hunt Has Cammock Appoint A Mystery Board.

In anticipation of the Disputed Directors' resignations, Hunt prepared a Board resolution by which Cammock purportedly would fill vacancies on the Board with Hunt and four other individuals. *See* JX 53. The unsigned, undated resolution recites that Swift, Hughes, and Nichols had resigned, thereby conceding that DiMarco had not.

In the version of the resolution that was produced in this litigation, Hunt blacked out his own name and the names of the four other individuals. During pretrial discovery, the Center refused to identify the names for the defendants. During the pretrial conference, I directed the Center's counsel to provide this information on the Wednesday before trial. After I raised the issue, counsel told me that he was instructed by "his client" not to comply. Dkt. 26. It was not until his cross examination during trial that Hunt identified

individuals whom the Center contends comprise the Board.

On April 27, 2012, believing that they had dealt with the Disputed Directors, Hunt and Cammock attempted to reengage the Friends Group. Cammock emailed Allen, stating:

> I would welcome to meet with you. The [Center's] board has been restructured and the board is open to continuing our talks with the AAEFD, the 107 nonprofit group or others after Tuesday, May 2, 2012.

JX 34. Allen did not bite. He wanted information about Hunt's role:

> Thanks for your note. Before [the Friends Group] would be willing to meet, we would want a list of the full new [Center] board and would also like to understand explicitly Martin Hunt's role. Once you forward that information, we will consider a discussion.

*Id.*

## N. Swift Attempts To Move Forward.

By email dated April 26, 2012, Swift attempted to notice a board of directors meeting for May 4. He testified at trial that he acted unilaterally because Cammock declined to call the meeting, something Cammock had never done before. On May 2, Cammock emailed Swift and told him: "I received your request for a meeting, however, the new board has accepted your resignation and at this time I am not available to meet with you Thursday morning." JX 65. The Disputed Directors met anyway.

By email dated May 11, 2012, Swift attempted to notice the annual meeting of the Board for May 24. Swift also sent a copy of the notice to Cammock by certified mail. On May 15, Smith emailed and sent by certified mail a letter from Cammock to the Disputed Directors. It stated:

> Please use this letter as verification that your resignation has been accepted as of May 2, 2012 and the reconstituted Board has acted to replace your vacancy [sic]. Upon information and belief, certain resigned members have attempted to break and enter the [Center] premises and may attempt to fraudulently conduct [Center] business.
>
> We remind you of the importance not [sic] to aid or abet such activities and to be cognizant of your continuing contractual and confidentiality responsibilities.

JX 56, Ex. A. at 3.

On May 24, 2012, the Disputed Directors and Johnson gathered at the Hockessin Fire Hall. Although given notice by email, Cammock and Mahotiere did not attend. The five directors present voted to add Fleming, Henderson, Lucas, and Woolford to the Board. They also established that the Center's regular Board meeting would take place the third Thursday of each month.

By email dated June 12, 2012, Swift noticed a meeting for June 21. Cammock, Hughes, Johnson, and Mahotiere were informed of the meeting, but did not attend. At the meeting, those present removed Cammock from his position as a director and officer, elected a new President, and decided that Johnson had retired.

## O. The Center Files Suit.

On August 17, 2012, with Smith still exercising operational control, the Center filed this action. The complaint seeks a determination of the lawful directors of the Center pursuant to Section 225(a) of the Delaware General Corporation Law (the "DGCL"), 8 *Del. C.* § 225(a). The complaint also seeks damages and equitable relief under theories of breach of contract, breach of fiduciary duty, and secondary liability. With the dysfunction at the Center having devolved into active litigation,

the Friends Group lost patience and commenced foreclosure proceedings. . The School Building and the Center's other real property were noticed for Sheriff's sale on October 9.

The Center asked for an expedited schedule that would enable the Court to determine the properly constituted Board before the Sheriff's sale. At the scheduling conference, the defendants waived any objection to the Center seeking relief under Section 225(a). *Compare* 8 *Del. C.* § 225(a) ("Upon application of any stockholder or director, or any officer whose title to office is contested, the Court of Chancery may hear and determine the validity of any election, appointment, removal or resignation of any director or officer of any corporation"), *with* 8 *Del. C.* § 225(b) ("Upon application of any stockholder or upon application of the Corporation itself, the Court of Chancery may hear and determine the result of any vote of stockholders upon matters other than the election of directors or officers"). The Section 225 count was expedited; the other counts were not.

## II. LEGAL ANALYSIS

 A Section 225 action is a form of *in rem* proceeding "where the defendants are before the court, not individually, but rather, as respondents being invited to litigate their claims to the *res* . . . or forever be barred from doing so." *Genger v. TR Investors, LLC,* 26 A.3d 180, 199–200 (Del.2011). The Court exercises jurisdiction "only for the limited purpose of determining the corporation's *de jure* directors and officers." *Id.* at 200. The Center, as plaintiff, "bears the burden of proving by a preponderance of the evidence that it is entitled to relief." *In re IAC/InterActive Corp.,* 948 A.2d 471, 493 (Del.Ch.2008). In considering the Center's claims, "the relative weight given to any particular piece of

evidence, and particularly witness testimony, is a matter for the court to determine as the trier of fact." *Id.* (internal quotation marks omitted).

## A. The Alleged Disqualification Of The Disputed Directors

 The Center first argues that the Disputed Directors disqualified themselves and ceased to be directors by failing to attend three board meetings in a row. At trial, Cammock testified that the Center's operative bylaws were an undated version containing the following provision: "If a Board member misses three (3) meetings unexcused, the Board, upon majority vote, may declare his/her position on the Board vacant." JX 47 at 2. Cammock testified that between September and December 2011, he called three Board meetings that the Disputed Directors did not attend. Tr. 29. He concluded that the Disputed Directors therefore no longer were directors.

Cammock did not cite, and the trial record does not contain, any evidence that the Board, "upon majority vote," ever declared vacant any of the Disputed Directors' positions. Moreover, the testimony of other trial witnesses and the documentary record refute Cammock's contentions about missed meetings. Cammock's ally, Smith, testified that Cammock had not called Board meetings between September and December 2011 and that he must have been thinking of management meetings that Cammock and she frequently held with key staffers. Tr. 69. The Disputed Directors testified that no Board meetings were called after September 2011 until April 2012, and the trial exhibits do not contain any notices or email communications for the meetings Cammock claimed to have called.

Equally important, the testimonial and documentary record disproved Cammock's contention that his undated set of bylaws

was the operative version. Cammock admitted on cross examination (Tr. 40–43) and Smith confirmed (Tr. 65–66) that the Bylaws had been updated at least twice since the version containing the disqualification provision, once in 2000 and again in 2010. Although Smith suggested that the Board only tentatively approved the 2010 version subject to further review, the 2010 Bylaws contain a certification stating, "These bylaws were approved at a meeting of the Board of Directors by a two-thirds majority vote on **DECEMBER 17, 2010.**" JX 56, Ex. D. at 8. Each of the Disputed Directors testified that the 2010 Bylaws actually were adopted. *See* Tr. 269, 285, 296. Swift explained in detail that the Bylaws were revised and formally approved in December 2010 in response to issues raised by then-pending litigation between the Center and a former board member. Tr. 261. Since December 2010, the Board has operated in accordance with the 2010 Bylaws. *See* Tr. 269–70, 295–96. DiMarco testified that he posted the 2010 Bylaws to the Center's website as the operative version. Tr. 296. I find that the 2010 Bylaws are the operative Bylaws of the Center.

The 2010 Bylaws (and, for that matter, the 2000 bylaws) do not contain the disqualification provision. Instead, Section 5.02(E) states:

> If a Board member misses three (3) consecutive meetings unexcused, s/he shall be contacted by the President, by Certificate of Mailing [sic], as to his or her interest or ability in continuing to serve as a member of the Board of Directors.

JX 56, Ex. D. at 2. In short, none of the Disputed Directors ran afoul of the no longer extant, never triggered, and never exercised disqualification provision.

## B. The Purported Director–Removal Right

The Center next contends that the Disputed Directors were validly removed pursuant to the director-removal right in the April Agreement. Factually and legally, this theory fails.

### 1. The Factual Problems

As a factual matter, the Center's theory founders because the Board never authorized or approved the director-removal right. The Disputed Directors testified that they never heard anything about a director-removal right until April 2012. They never saw the actual April Agreement containing the director-removal right until this litigation. The Letter of Intent, which the Board did see and approve, said nothing about HWI Partners or its designee obtaining a director-removal right.

At trial, Hunt claimed that he described the director-removal right in a PowerPoint presentation that he gave to the full Board in September 2011. Tr. 176. The presentation is not in the record, and Hunt never met with the full Board in September, only with subsets of the directors. Nor do I believe that Hunt aggressively demanded the director-removal right so early in the process. At the time, Hunt was still trying to talk his way into a deal. Proposing the director-removal right would have jeopardized his chances. Moreover, after the Board approved the Letter of Intent, Hunt never threatened to exercise a director-removal right. By contrast, he had no qualms about invoking the confidentiality obligations in the Letter of Intent. If Hunt thought he possessed the director-removal right, he certainly would have referred to it in one or more of his blustery email missives.

At trial, Hunt and Smith testified that they believed the Board authorized Smith to negotiate a final agreement embodying

the Letter of Intent, and that this grant included authority to concede provisions like the director-removal right. That is not so. The Board authorized Smith to negotiate a final agreement with the expectation that (i) the Board ultimately would have to approve its specific terms and (ii) the details would be consistent with and not materially depart from the Letter of Intent. Agreeing to a director-removal right went far beyond Smith's authority.

In addition to the Board never agreeing to the director-removal right, Hunt never validly exercised it. According to Hunt, the Foundation had the right under the April Agreement to decide that the Board had to go, at which point HWI Partners had the right in its sole discretion to reconstitute the Board. There is no documentary evidence indicating that the Foundation ever made such a determination or that HWI Partners ever exercised an appointment right. Hunt testified that he exercised the removal right by going to Johnson's home on April 13, 2012, and drafting a press release. Tr. 211. Johnson is a director of the Center, served as Secretary, and frequently kept the minutes, but there is no reason to think that she was the authorized point of contact for the purported exercise of the Foundation's director-removal right. Moreover, the press release that Hunt referenced says nothing about directors being removed or the Board being reconstituted. See JX 74. Its statement that the Center "has formed three core steering committees to be announced soon to partner with a host of friends at historical societies and organizations in the region," is not an explicit or implicit exercise of a removal right. Id. And there is no evidence indicating that the Center actually formed any steering committees.

### 2. The Legal Problem

■ As a legal matter, the Board removal right violates Delaware law and is inconsistent with Section 141(k) of the DGCL. See 8 Del. C. § 141(k). Applying this provision to the Center requires some statutory gymnastics.

The Center is a Delaware charitable nonstock corporation. "A 'charitable nonstock corporation' is any nonprofit nonstock corporation that is exempt from taxation under § 501(c)(3) of the United States Internal Revenue Code, or any successor provisions." Id. § 114(d)(1) (footnote omitted). "A 'nonstock corporation' is any corporation organized under this chapter that is not authorized to issue capital stock." Id. § 114(d)(4). "A 'nonprofit nonstock corporation' is a nonstock corporation that does not have membership interests." Id. § 114(d)(3). "A 'membership interest' is, unless otherwise provided in a nonstock corporation's certificate of incorporation, a member's share of the profits and losses of a nonstock corporation, or a member's right to receive distributions of the nonstock corporation's assets, or both." Id. § 114(d)(2). The Center is not authorized to issue capital stock and is exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. See JX 56, Ex. C; Pre–Trial Order at 1.

"Delaware has not provided a separate statute for nonstock corporations, but has instead dealt with such corporations within the ambit of the DGCL." John Mark Zeberkiewicz & Blake Rohrbacher, New Day for Nonstock Corporations: The 2010 Amendments to Delaware's General Corporation Law, 66 Bus. Law. 271, 272 (2011) [hereinafter Nonstock Corporations]. The DGCL applies to nonstock provisions via Section 114, a "'translator' provision setting forth which provisions of the DGCL apply to all nonstock corpora-

tions and which of those provisions apply specifically to nonprofit nonstock corporations." *Nonstock Corporations* at 273. Subsection 114(a) provides that the provisions of the DGCL apply generally to nonstock corporations, except as set forth in subsections 114(b) or 114(c). 8 *Del. C.* § 114(a). Subsection 114(a) translates the provisions governing stock corporations into nonstock language using the following definitions:

(1) All references to stockholders of the corporation shall be deemed to refer to members of the corporation;

(2) All references to the board of directors of the corporation shall be deemed to refer to the governing body of the corporation;

(3) All references to directors or to members of the board of directors of the corporation shall be deemed to refer to members of the governing body of the corporation; and

(4) All references to stock, capital stock, or shares thereof of a corporation authorized to issue capital stock shall be deemed to refer to memberships of a nonprofit nonstock corporation and to membership interests of any other nonstock corporation.

*Id.* Subsection 114(b)(1) excludes from the scope of the translator provision a list of sections that do not need translation because they already "apply to nonstock corporations by their terms." *Id.* § 114(b)(1). Subsection 114(b)(2) excludes from the scope of the translator provision a list of provisions that cannot apply to nonstock corporations because they deal with stock and issues related to stock. *Id.* § 114(b)(2). Subsection 114(b)(3) excludes subchapter XIV, which governs close corporations, and subchapter XV, which governs foreign corporations. *Id.* § 114(b)(3). Subsection 114(c) identifies additional sec-

tions that do not apply to nonprofit nonstock corporations. *Id.* § 114(c).

Section 114(b)(1) identifies Section 141 as one of the provisions of the DGCL that "apply to nonstock corporations by their terms." 8 *Del. C.* § 114(b)(2). This is because Section 141 contains its own more venerable, mini-translator provision, which parallels in substance the general translator provision in Section 114. *Compare* 8 *Del. C.* § 141(j) *with* § 114(a). After applying the translator, Section 141(k) reads as follows:

Any member of the governing body of the corporation or the entire governing body of the corporation may be removed, with or without cause, by the holders of a majority of the memberships then entitled to vote at an election of the members of the governing body of the corporation, except as follows:

(1) Unless the certificate of incorporation otherwise provides, in the case of a corporation whose governing body is classified as provided in subsection (d) of this section, members of the corporation may effect such removal only for cause....

8 *Del. C.* § 141(k) (translation added).

The next step in applying Section 141(k) is to identify the Center's governing body and members. Identifying the governing body is easy. Article Ninth of the Center's Charter provides that "[t]he activities and affairs of the corporation shall be managed by a Board of Directors." JX 56, Ex. C. Article IV of the 2010 Bylaws states that "[t]he Board of Directors shall serve as the corporation's governing body." JX 56, Ex. D. Dual terminology of this sort is common in the nonstock realm. "Just as the Spanish *perro* and the English *dog* refer to the same animal, the nonstock 'governing body' and the stock 'board of directors' each refer to the group of individuals charged with managing the corpo-

ration's business and affairs." *Nonstock Corporations* at 281 n. 45. "[A] nonstock corporation—regardless of what term it uses (board of directors, board of managers, board of trustees, management committee, etc.)—technically does not have a board of directors; it has a governing body." *Id.* at 294 n. 100.

Identifying the Center's members is more difficult. According to the DGCL,

> [t]he conditions of membership, or other criteria for identifying members, of nonstock corporations shall likewise be stated in the certificate of incorporation or the bylaws.... If neither the certificate of incorporation nor the bylaws ... state the conditions of membership, or other criteria for identifying members, the members ... shall be deemed to be those entitled to vote for the election of the members of the governing body....

8 *Del. C.* § 102(a)(4). The Center's Charter states that "the conditions of membership shall be stated in the By–Laws." *See* JX 56, Ex. C. The 2010 Bylaws do not state any conditions for membership (nor did any of the earlier versions). Consequently, the members of the Center are deemed to be "those entitled to vote for the election of the members of the governing body." 8 *Del. C.* § 102(a)(4).

In Section 6.01(G), the 2010 Bylaws have this to say about the annual meeting for the election of directors:

> There shall be an annual meeting of the Board of Directors of [the Center] in May, each year. At this meeting, the following items of business will be conducted in addition to any other matters before the Board:
>
> 1. Election of one-third of the Board members to a 3–year term;
>
> 2. Election of officers;

> 3. Dissemination of the Annual Report from the President of the Board.

JX 56, Ex. D. at 4. By contemplating that the election of one-third of the Board will take place at an annual meeting of the Board, the Bylaws implicitly provide that the then-current members of the Board are those individuals "entitled to vote for the election of the members of the governing body pursuant to the certificate of incorporation or bylaws of such corporation." 8 *Del. C.* § 102(b)(4). The then-current members of the Board are therefore the members of the corporation.

Three conclusions follow from applying the language of Section 141(k) to the Center. First, the governing body is classified. *See* JX 56, Ex. D. at 2 ("One-third of the elected membership of the Board of Directors shall be elected annually to serve a term of three (3) years."). Second, only a majority of the members can remove the members of the governing body. Third, they can do so only for cause. *See Instituform of N. Am., Inc. v. Chandler*, 534 A.2d 257, 267 (Del.Ch.1987) (Allen, C.); *Essential Enters. Corp. v. Automatic Steel Prods., Inc.*, 159 A.2d 288, 290–91 (Del.Ch. 1960) (Seitz, C.).

These conclusions lead ineluctably to the invalidity of the director-removal right. That provision purported to grant HWI Partners, rather than a majority of the members, the right to remove directors. It also purported to permit removal without cause. Both aspects conflict with Section 141(k). As a matter of law, the right could not be exercised to remove the Disputed Directors. *Cf. Crown EMAK P'rs, LLC v. Kurz*, 992 A.2d 377, 399–401 (Del. 2010).

## C. The Alleged Resignations

▮▮▮ The Center alternatively contends that Hughes, Nichols, and Swift re-

signed and that their resignations were accepted by the Center. Translated to apply to a nonstock corporation, Section 141(b) states:

> Each member of the governing body of the corporation shall hold office until such member's successor is elected and qualified or until such member's earlier resignation or removal. Any member may resign at any time upon notice given in writing or by electronic transmission to the corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events.

8 *Del. C.* § 141(b) (translation added). "Determining whether a director or officer has resigned is a question of fact determined by the circumstances of each case." *Dionisi v. DeCampli*, 1995 WL 398536, at *8 (Del.Ch. June 28, 1995). "Loose and ambiguous language will not be regarded as sufficient [to establish a resignation], at least where the subsequent acts and declarations of the [individual] are inconsistent with any such contention." *Lasher v. Inter–Continental Biologics, Inc.*, 1984 WL 137716, at *8 (Del.Ch. Jun. 14, 1984) (internal quotation marks omitted).

The evidence demonstrates that Swift, Hughes, and Nichols did not resign. Reading their communications literally, Swift and Nichols each wrote that they would be resigning in writing in the future. Swift additionally specified that his resignation, when submitted, would not be effective until April 30. Hughes merely declined to serve on what she understood to be a new advisory committee.

Assuming for the sake of argument that the directors' communications were appropriately viewed as resignations, they still would not be effective because they were obtained under false pretenses. Cammock's April 20 email incorrectly represented that a transaction "with HWI through the Hockessin Heritage Foundation" was "complete" and that the "the reconstitution of a new board" was "well underway." JX 1 at 2. Cammock's email also sought to create the misleading and incorrect impression that the directors' only choice was whether or not to continue on a new advisory committee. Just as a quorum requirement will be deemed unmet when a director's attendance is obtained by trickery, and just as board action taken at a special meeting will be deemed invalid when the notice misrepresents the purpose of the meeting, so too a resignation will be deemed invalid if obtained through trickery or misrepresentation.[5]

The emails on which the Center relies were not resignations and, to the extent they could be construed as such, were improperly obtained. Hughes, Nichols, and Swift did not resign from the Board.

## D. The Supposed Non–Election Of The Disputed Directors

In an effort to reach back in time and terminate the Disputed Directors' title to office at the source, the Center argues that not one of the Disputed Directors was ever properly elected or appointed. According

---

5. *Cf. Fogel v. U.S. Energy Sys., Inc.*, 2007 WL 4438978, at *3 (Del.Ch. Dec. 13, 2007) ("Where a director is tricked or deceived about the true purpose of a [special] board meeting, and where that director subsequently does not participate in that meeting, any action purportedly taken there is invalid and void."); *Schroder v. Scotten, Dillon Co.*, 299 A.2d 431, 436 (Del.Ch.1972) ("A quorum obtained by trickery is invalid and the reasoning which forbids trickery in securing a quorum applies equally well to securing the absence of opposing directors from a meeting by representing that such a meeting will not be held." (internal citation omitted)).

to the Center each was "appointed to the Board by Board President Leslie Cammock ... though no formal vote was taken on [the] nomination and no resolution was ever passed designating [the individual] as a Board member." Compl. ¶ 9 (challenging Swift); *accord id.* ¶¶ 12, 15, 18 (challenging Hughes, Nichols, and DiMarco). Under the circumstances, the Disputed Directors are *de facto* directors whose terms will end with the next election.

The Center has not historically followed corporate formalities when electing directors. The record includes a composite exhibit comprising minutes of numerous meetings held between 1998 and 2006 (*see* JX 14) and a second composite exhibit comprising minutes of meetings held between 2009 and 2011 (*see* JX 73). The only minutes referring to an annual election of directors were from January 20, 2002, when an election was held after an individual not supported by the incumbent directors asked to join the Board. Otherwise, the minutes frequently (albeit not consistently) refer to annual elections for officers, but not annual elections for directors. It appears that in lieu of annual elections, the Board perpetuated itself by filling vacancies when existing directors resigned, when candidates were recruited by existing directors, or when individuals expressed interest in joining the Board and were viewed favorably by the Center's leadership. The Board at all relevant times had vacancies to fill. Every iteration of the Center's bylaws has authorized a Board with up to 25 members. In recent times, the Board does not appear to have approached its maximum size.

Although there are occasional references in the minutes to a director making a motion to add a new director and receiving a second, the minutes do not record any actual resolutions or votes. The Center's practice appears to have been for Cammock, acting as Board President, to appoint new directors without formal Board action, and for those individuals to serve until they eventually resigned. Each of the Disputed Directors appears to have joined the Board by this method.

Although practical, the Center's informal procedure did not comply with Delaware law. Translated to apply to a non-stock corporation, Section 223(a)(1) of the DGCL provides as follows:

Vacancies and newly created memberships on the governing body of the corporation resulting from any increase in the authorized number of members of the governing body of the corporation elected by all of the members of the corporation having the right to vote as a single class may be filled by a majority of the members of the governing body of the corporation, although less than a quorum, or by a sole remaining member of the governing body of the corporation.

8 *Del. C.* § 223(a)(1) (translation added). Consequently, Cammock only could have filled vacancies by Presidential appointment if he was the sole remaining director, which he never was.

■ The failure of the Center to follow corporate formalities when adding directors does not cause those individuals' status as directors to evaporate. It rather confers on them the status of *de facto* directors.

A [d]e facto director is one who is in possession of and exercising the powers of that office under claim and color of an election, although he is not a director [d]e jure and may be removed by proper proceedings. Where a director assumes office pursuant to an irregular election in violation of the provisions of the corporate charter, he achieves only [d]e facto status which may be successfully attacked by the stockholders.

*Prickett v. Am. Steel & Pump Corp.*, 253 A.2d 86, 88 (Del.Ch.1969); *see also McWhirter v. Washington Royalties Co.*, 152 A. 220, 223 (Del.Ch.1930) (explaining that "[t]he outstanding and distinguishing feature of a de facto officer is that he is in fact occupying the office under color of right and performing its duties").

In *Prickett*, two directors were elected by stockholders to one-year terms that conflicted with a charter provision establishing a staggered board. The Court found an "irreconcilable conflict" between the method of their election and the classified board provision, resulting in an " 'irregular' election" that produced only *de facto* status. 253 A.2d at 88–89. The Court held that their status as directors would end at the next election of directors. *Id.* at 89.

Swift, Nichols, and DiMarco joined the board in 2009, and Hughes joined in 2010. Each joined under color of right according to what everyone involved believed was a legitimate appointment process. Since then, each participated in multiple board meetings per year, voted on numerous issues, and devoted significant time and energy to the business and affairs of the Center. Cammock, DiMarco, and Swift appeared together as directors of the Center at a hearing in the Petrucon litigation. And in this very case, the Center has sued the Disputed Directors for breach of fiduciary duty based on their status as directors. The Center also relies in this action on the Letter of Intent and con-

tends that the Board validly authorized it, but under Section 5.01 of the 2010 Bylaws, the Board only could have acted if there were at least seven directors in office. If DiMarco, Hughes, Nichols, and Swift were not directors, then the Board only had three members and could not have approved the Letter of Intent.[6] On the facts presented, the Disputed Directors validly serve on the Board as *de facto* directors.

## E. The Purported Addition Of Hunt And His Colleagues

The Center asserts that by means of an undated resolution, Hunt and four others were appointed to the Board. JX 53. At trial, Hunt testified that the resolution became effective on April 25, 2012. Tr. 218. At least two legal defects invalidate the resolution.

In its resolving clause, the April 25 resolution states:

> **NOW BE IT RESOLVED THAT,** the new board members are elected as required and that the reconstituted board consists of the following: Mr. Leslie Cammock, Gerard Mahotiere, Martin Hunt, Brian Holland, Tim Fox, Marc Mathis, and Dr. Garikai Campbell[7] *by unanimous vote and consent of the aforementioned,* pursuant to the [April] Agreement.

JX 53 (emphasis added). Read literally, the resolution purports to have the five

6. As an aside, if the 2000 version of the bylaws were valid, the Board only could have acted if there were at least nine directors in office, so the Letter of Intent would not be valid regardless. This is another reason to reject Smith's contention at trial that the 2010 Bylaws were not adopted and that the 2000 version continued to govern. *See supra,* Part II.A.

7. I have inserted the names of the five directors who Hunt testified joined the Board pursuant to this resolution. As previously discussed, the Center declined to identify the individuals whom it contends serve on the Board, and Hunt blacked out the names, including his own, on the copy of the resolution that was produced in discovery and introduced into evidence at trial.

candidates appointed by the resolution vote to appoint themselves to the Board.[8]

■ As discussed above, under the Center's Charter, Bylaws, and Section 223(a)(1) of the DGCL, vacancies may be filled by a majority of the members of the governing body then in office, even if less than a quorum, or by a sole remaining member of the governing body. *See* 8 *Del. C.* § 223(a)(1) (translation added). A non-director cannot vote to fill a vacancy. To the extent the resolution relied on Hunt and his fellow candidates to appoint themselves to the Board, it was circular and invalid.

■ The resolution was equally invalid because the filling of vacancies was not accomplished by the vote of a majority of the directors then in office acting at a meeting or by the consent of all directors then in office acting in writing. *See* 8 *Del. C.* §§ 141(b), (f). The Center does not contend that DiMarco resigned. Assuming for the sake of argument that the Center were correct about who was a director on April 25, the Board consisted of Cammock, Mahotiere, and DiMarco. Under the DGCL, directors can only act at a board meeting or by unanimous written consent.

Hunt admitted at trial that the April 25 resolution was not approved at a Board meeting. He contended that it was approved through a combination of telephone calls and emails. Tr. 219. But under the DGCL,

> any action required or permitted to be taken at any meeting of the governing body of the corporation may be taken without a meeting if *all members of the governing body . . . consent thereto in writing*, or by electronic transmission

and the writing or writings or electronic transmission or transmissions are filed with the minutes of the proceedings of the governing body of the corporation. 8 *Del. C.* § 141(k) (emphasis and translation added). DiMarco did not approve the resolution filling vacancies, rendering it invalid for lack of unanimous written consent.

These statutory defects invalidate the April 25 resolution.

**F. The Partial Validity Of The Actions Taken At The May And June Meetings**

■ The defendants contend that Swift called, convened, and conducted Board meetings in May and June at which the Disputed Directors reconstituted the Board. The actions taken at those meetings were partially valid.

■ "The by-laws normally govern the process of calling [board] meetings." R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* § 4.8[A] at 4–22 (2009 Supp.). "A typical by-law permits the chairman, president, secretary, or a fixed number of directors to call a meeting." *Id.* Action taken at a board meeting that was not called in compliance with the bylaws may be deemed void. *See In re Bigmar, Inc.,* 2002 WL 550469, at *18–19 (Del.Ch. Apr. 5, 2002) (evaluating the calling of and giving of notice for a special board meeting for compliance with bylaws).

The Center's Bylaws contemplate three types of Board meetings: regular, annual, and special. Section 6.01 calls for regular meetings of the Board to be held a minimum of six times per year. *See* JX 56, Ex.

---

**8.** As with the Confidentiality Agreement, Letter of Intent, January Amendment, and April Agreement, Hunt claimed that the April 25 resolution was drafted by counsel, but he could not remember by whom. Tr. 219.

D. at 4. Section 6.01(G) provides that "[t]here shall be an annual meeting of the Board of Directors of [the Center] in May, each year." *Id.* at 4. Section 6.02 provides that "Special Meetings may be called by the President of the Board." *Id.* at 5.

Swift purported to notice a special meeting of the Board on May 4, the annual meeting of the Board on May 24, and a regular meeting of the Board on June 21. During 2011 and 2012, the Board only convened when Cammock called a special meeting. No regular meetings had been scheduled for 2012, and the annual meeting had not been scheduled for 2012.

There are no provisions in the Charter or Bylaws specifying how regular meetings or the annual meeting are scheduled. By default, therefore, scheduling these meetings falls within the general authority of the Board, which can act at a meeting by vote of a majority of a quorum, or without a meeting by action through unanimous consent. *See* 8 *Del. C.* §§ 141(b), (f). Section 6.02 of the Bylaws authorizes the President of the Board to call special meetings. When Swift called his meetings, he was not carrying out a Board decision made at an earlier meeting or by unanimous written consent, nor was he exercising authority as Board President. Technically, therefore, Swift lacked authority as an individual director to call the meetings.

▇▇▇ Under the facts of the case, however, I regard both the May 24 and June 21 meetings as validly called. Equity "regards that as done which in good conscience ought to be done." *Monroe Park v. Metro. Life Ins. Co.,* 457 A.2d 734, 737 (Del.1983); *see also Marvel v. Ortlip,* 3 Del.Ch. 9, 33 (1866) (citing the maxim of "treating that as done which ought to have been done."). On April 26, 2012, Swift asked for a Board meeting so the directors could receive information about and dis-cuss the status of negotiations with the Friends Group and the purported April Agreement. In light of Swift's request, and given the highly material events that had occurred about which the directors other than Cammock and Swift were uninformed, Cammock should have called a special meeting. Instead, prompted by Hunt, Cammock called for the directors' resignations. Swift testified credibly at trial that he noticed, called, and convened meetings only because Cammock failed to act.

All of the directors received actual notice of the May 4 meeting sufficiently in advance of the meeting to satisfy the timing requirements of the 2010 Bylaws. Only Cammock was absent. Although there are no minutes in the record documenting what took place at the May 4 meeting, it is reasonable to infer that at least a majority of the six directors decided to meet again.

For the May 24 meeting, all of the directors again received actual notice sufficiently in advance of the meeting to satisfy the timing requirements of the Bylaws. A quorum of the Board was present on May 24, consisting of DiMarco, Hughes, Johnson, Nichols, and Swift. Cammock and Mahotiere were absent.

Under these circumstances, I find that the May 24 meeting was validly called, convened, and conducted. If Cammock had called a special meeting promptly, as Swift requested, then a majority of the directors could have taken action at that meeting, or they could have scheduled another meeting, a series of meetings, or the annual meeting. To fail to recognize the May 24 meeting as valid would legitimize Cammock's decision to decline to call a special meeting. His dereliction of duty would become a veto over Board action. The business and affairs of a Delaware

corporation are governed by its board of directors, not the Board President. *See* 8 *Del. C.* § 141(a). Cammock's authority as an officer was subordinate to the Board's authority. In his capacity as President, Cammock was an agent of the corporation, and he had a duty to carry out the decisions of the Board. It would elevate the President's authority as an officer and agent above the Board's authority as principal and authorized decision-maker to permit the President to incapacitate the Board by declining to call a special meeting.

To decide this case, I need not consider whether under some different corporate governance structure, there might be some basis for an individual like Cammock to possess a blocking right. Under the Charter and Bylaws of the Center, the Board always could act by a majority of a quorum to schedule a meeting, including a special meeting. The President's power to call a special meeting of the Board under Section 6.02 of the Bylaws is best read as permissive, but even if it were exclusive, the Board could amend the Bylaws to modify that provision by the vote of a majority of a quorum. Under the circumstances of this case, where Cammock had attempted to incapacitate the Board for over a month by failing to call a special meeting, when all directors received adequate notice of both the May 4 meeting and the May 24 meeting, and when a quorum was present on both May 4 and May 24, I find that the power to hold the May 24 meeting had returned to and was validly exercised by the Board. *Cf. Campbell v. Loew's, Inc.,* 134 A.2d 852, 863 (Del.Ch.1957) (Seitz, C.) (noting that even where the president had "the power to call a [special] stockholders' meeting to elect directors," he had "no legal standing to make 'his' faction the exclusive voice of" the company).

At the May 24 meeting, Fleming, Henderson, Lucas, and Woolford were added to the Board. Although the directors styled the May 24 meeting as an "annual meeting," they clearly viewed it as a meeting of the Board, rather than a meeting of members. Consistent with that view, it does not appear that any of the Disputed Directors viewed their terms as expiring at the meeting, even though DiMarco, Nichols, and Swift joined the Board in 2009. I therefore find that the Board added Fleming, Henderson, Lucas, and Woolford by filling vacancies. The Board also validly put into place a schedule under which regular Board meetings would take place on the third Thursday of each month.

On June 21, 2012, the Board held a regular meeting in accordance with the schedule adopted on May 24. DiMarco, Fleming, Henderson, Lucas, Nichols, Swift, and Woolford attended in person, and Johnson participated by telephone. Cammock, Hughes, and Mahotiere were absent. Having met the quorum requirement of the Bylaws, the Board took certain actions that were valid and certain actions that were not. On the valid side of the ledger, the Board properly removed Cammock from his position as President. Section 7.04 of the Bylaws states that "[a]ny officer elected or appointed by the Board of Directors may be removed at any time by a majority vote of the Board of Directors." JX 56, Ex. D. at 5. The Board also properly elected Fleming to replace Johnson. *See* JX 56, Ex. D. §§ 6.01(c), 7.01.

On the invalid side of the ledger, the Board also purported to remove Cammock as a director. In doing so, they relied on Section 5.04(A) of the Bylaws, which provides that "[m]embers [of the Board] who exceed or attempt to exceed their authority may be removed by a majority vote of the Board" and further pro-

vides that "[a]ny Board Member may be removed for cause, malfeasance, and etc. [sic]." JX 56, Ex. D. at 3. To the extent this provision purported to authorize directors to remove other directors, it is invalid. *See Kurz v. Holbrook,* 989 A.2d 140, 157 (Del.Ch.2010) ("For 89 years, Delaware law has barred directors from removing other directors."), *aff'd in pertinent part, rev'd in part on other grounds,* 992 A.2d 377 (Del.2010). Although Section 5.04(A) also speaks of removing directors for cause, the for-cause removal right only can be exercised by the members of the corporation, not the members of the governing body. *See* 8 *Del. C.* § 141(k). Admittedly the members of the Center and the members of its governing body are coterminous, but the individuals who took action on June 21 purported to do so as members of the governing body (*viz.* the Board), not as members of the corporation. In addition, a director only can be removed for cause after being given notice of the charges and an opportunity to be heard. *Campbell,* 134 A.2d at 857. Cammock was not provided with those procedural protections. Consequently, although validly removed as President, Cammock continues as a director.

Similar principles dictate that Johnson remain a director. On June 21, the Board decided that Johnson's term as a director had expired at the annual meeting supposedly held on May 24. If the annual meeting had been an annual meeting of members, then Johnson's term would have expired. So too would the terms of the Disputed Directors, all of whom were *de facto* directors. Cammock's term also would have expired, because at that point he was a holdover director, having been last elected in 2002. *See Dolgoff v. Projectavision, Inc.,* 1996 WL 91945, at *1 (Del.Ch. Feb. 29, 1996) (Allen, C.) (ruling that holdover directors must stand for election at the next annual meeting). But as I already have held, the Board met on May 24 for an annual meeting of directors, not an annual meeting of members. Johnson therefore continues to serve as a holdover director, as does Cammock. To the extent the Board directed her to retire or attempted to shorten her term, that action was invalid. *Cf. Crown EMAK,* 992 A.2d at 399–401. The Board had authority to remove Johnson from her position as Secretary, just as it could remove Cammock as President. *See* JX 56, Ex. D. § 7.04.

## III. CONCLUSION

In light of the foregoing holdings, Cammock, DiMarco, Fleming, Henderson, Hughes, Johnson, Lucas, Mahotiere, Nichols, Swift, and Woolford are the lawful members of the Board. Fleming is Board President. This decision does not address any of the other claims in the complaint. It will be up to the duly elected Board to decide whether or not to assert those claims and any other causes of action that the Center may have. An implementing order has been entered.