# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RAINBOW MOUNTAIN, INC., a Delaware corporation, | ) ) ) | |
| Plaintiff/Counterclaim Defendant, | ) ) ) ) | |
| v. | ) ) | C.A. No. 2018-0403-PAF |
| TERRY BEGEMAN, | ) ) ) | |
| Defendant/Counterclaim Plaintiff and Third-Party Plaintiff, | ) ) ) ) | |
| v. | ) ) ) | |
| JEFFREY BEGEMAN, SUSAN BEGEMAN, MYSTIE BEGEMAN, LAURIE LARIMAR, JASON BEGEMAN, MELANIE KETCHUM, TODD BEGEMAN, BONNIE BEGEMAN, JUSTIN BEGEMAN, COREY BEGEMAN, EMILY MCGEE, CINDY DALLWIG, ROGER DALLWIG, JENNIFER RAY, JEREMY NICHILO, CARLY NICHILO, JOSHUA NICHILO, and MARK BEGEMAN, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Third-Party Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 10, 2025
Date Decided: August 25, 2025

Ellis H. Huff, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Attorney for Plaintiff Rainbow Mountain, Inc.*

Terry Begeman, *pro se.*

**FIORAVANTI, Vice Chancellor**

This action involves a dispute among five siblings and their extended families over the management and membership of a Delaware nonstock corporation formed to hold and manage a rural property in Virginia. One faction, ostensibly on behalf of the corporation, seeks an order declaring that the governing body validly terminated one sibling's membership and that he has no right to occupy a dwelling on the property. The allegedly terminated sibling has counterclaimed, contending that his removal was ineffective because most of the members of the governing body who acted to oust him had already been removed and replaced by a written member consent delivered two months earlier. The allegedly terminated sibling seeks an order declaring that the written consent is valid, his removal two months later is invalid, and the written consent amended the certificate of incorporation to transform the corporation to a for-profit entity.

In this post-trial opinion, the court concludes that the written consent validly replaced the prior governing body. Therefore, the subsequent attempt to remove the disfavored sibling was ineffective. The court further concludes that the attempted amendment of the certificate of incorporation was invalid. The court denies all other requests for relief and orders the corporation to hold an annual meeting of the members to elect a governing body, which shall be overseen by a Magistrate in Chancery.

## I.    FACTUAL BACKGROUND[1]

### A.    The Parties

Plaintiff and counterclaim defendant Rainbow Mountain, Inc. ("RMI" or the "Company") is a family-operated nonstock Delaware corporation.[2]    Sheridan Begeman and Barbara Begeman (collectively the "Founders") incorporated RMI in 1986 as a nonprofit corporation.[3]  The Company's Certificate of Incorporation (the "Certificate") specifies that RMI "is organized exclusively for charitable, religious, educational and scientific purposes, including, for such purposes, the making of distributions to organizations that qualify as exempt organizations under

---

[1] Trial exhibits are cited as "JX"; stipulated facts in the pretrial order are cited as "PTO"; and references to the docket are cited as "Dkt.," with each followed by the relevant section, page, paragraph, exhibit, or docket number.  Several of the parties and individuals featured in this opinion share the surname "Begeman."  After first identifying Begeman family members by their full names, this opinion will generally refer to them by their first names. This is done solely for clarity and without intending disrespect or familiarity.  Citations to testimony at trial are cited in the form "Tr. (X)," with "X" representing the name and the surname of the speaker.  When resolving factual disputes, this opinion generally gives more weight to contemporaneous documents.  *See Lynch v. Gonzalez*, 2020 WL 4381604, at *5 (Del. Ch. July 31, 2020) ("[T]he relative weight given to any particular piece of evidence, and particularly witness testimony, is a matter for the court to determine as the trier of fact." (citation modified)), *aff'd*, 253 A.3d 556 (Del. 2021) (TABLE); *see, e.g., BCIM Strategic Value Master Fund, LP v. HFF, Inc.*, 2022 WL 304840, at *2 (Del. Ch. Feb. 2, 2022) ("The witness testimony often conflicted with the contemporaneous record.  In resolving factual disputes, this decision generally has given greater weight to the contemporaneous documents.").

[2] JX 2 ("Certificate").  PTO ¶¶ 1, 4; Tr. 7:13−16 (Jordan).  The Certificate was renewed and revived on July 3, 2002.  *See* JX 4.

[3] Certificate Art. III; PTO ¶¶ 1, 8; *see* Tr. 7:13−16 (Jordan); *id.* at 125:7−17, 128:18−129:19, 204:10−14 (Jeffrey Begeman); JX 74; JX 81.

Section 501(c)(3) of the Internal Revenue Code of 1954."[4] On August 26, 1986, the Founders executed a deed conveying a 97.6-acre parcel of land situated in Massies Mill Magisterial District of Nelson County, Virginia (the "Property") to RMI.[5]

The Founders had six children: Cindy Dallwig, Jeffrey Begeman, Laurie Larimar, Mark Begeman, Terry Begeman, and Todd Begeman.[6] Additional members of the Founders' extended family include Bonnie Begeman, Carly Nichilo, Eric Ketchum, Jason Begeman, Jennifer Ray, Jeremy Nichilo, Joshua Nichilo, Melanie Ketchum, Mystie Begeman, Roger Dallwig, and Susan Begeman.[7]

The Company and the Property have been at the center of multiple family disputes in both Virginia and Delaware for more than two decades.[8] These disputes have involved questions of control, governance, membership, and the continued corporate existence of RMI. Litigation began in 2002, when RMI successfully

---

[4] Certificate Art. III; JX 103. RMI has never registered as a tax-exempt organization with the Internal Revenue Service. Tr. 200:3−201:18 (Jeffrey Begeman). *See id.* at 400:6−20 (Terry Begeman) (describing the reasons behind the decision to incorporate and to include a reference to Section 501(c)(3) of the Internal Revenue Code of 1954 in the Certificate). The Company has not generated any revenue, other than contributions from members to pay expenses. *Id.* at 260:16−18 (Susan Begeman).

[5] JX 3; PTO ¶¶ 1, 10; Tr. 126:23−127:2, 203:5−9 (Jeffrey Begeman).

[6] PTO ¶ 9.

[7] *Id.* ¶ 3.

[8] *Id.* ¶ 1; JX 7 at 1−2; JX 8; JX 10 at 4, 6; JX 48; JX 49; JX 59; JX 60. *See Rainbow Mountain, Inc. v. Begeman*, 2017 WL 1097143, at *7 (Del. Ch. Mar. 23, 2017).

3

challenged an attempted conveyance of the Property and its proposed dissolution.[9]

Subsequent disagreements among RMI's members and the members of RMI's governing body led to additional proceedings, including efforts to clarify the composition of the Company's governing body, member rights, and the authority to occupy portions of the Property.[10] In the course of these proceedings, Terry had advocated for changes to RMI's governance and nonprofit status.[11] His ultimate objective has been to dissolve the Company and sell the Property to obtain his share of the sale proceeds.[12] In that regard, Terry has refused to contribute to paying any of the Company's expenses since 2008, despite his occupying a cabin on the Property.[13]

---

[9] JX 6; JX 12; JX 13; JX 14; JX 123; Tr. 133:15−24 (Jeffrey Begeman).

[10] JX 28; JX 40; JX 54; Tr. 139:15−140:16 (Jeffrey Begeman).

[11] *See e.g.*, Dkt. 18 ("Counterclaim") ¶¶ 95−100; Def.'s Post-Trial Opening Br. 46−50.

[12] JX 9; JX 48 at 1.

[13] Tr. 345:19−348:12 (Terry Begeman); JX 28 at 7.

### B. RMI's Bylaws[14]

#### 1. Members

RMI's bylaws (the "Bylaws") provide for three classes of membership in the Company and their requisite qualifications.[15] Class A, or "Regular," members must be at least 35 years old and must be either descendants of both Founders or "lawfully

---

[14] The RMI Certificate and Bylaws refer to RMI's governing body as a "Board of Directors" and the members of the governing body as "Directors." *See* Certificate; JX 73 ("Bylaws"). Delaware does not have a separate statute governing nonstock corporations. Rather, the Delaware General Corporation Law ("DGCL") "applies to nonstock provisions via Section 114, a 'translator' provision setting forth which provisions of the DGCL apply to all nonstock corporations and which of those provisions apply specifically to nonprofit nonstock corporations." *Hockessin Cmty. Ctr., Inc. v. Swift*, 59 A.3d 437, 455–56 (Del. Ch. 2012) (citation modified) (quoting John Mark Zeberkiewicz & Blake Rohrbacher, *New Day for Nonstock Corporations: The 2010 Amendments to Delaware's General Corporation Law*, 66 Bus. Law. 271, 273 (2011) (hereinafter "*New Day*"). The DGCL applies generally to nonstock corporations, except as otherwise provided. *See* 8 *Del. C.* § 114(a). Section 114(a) translates the statutory references as follows:

> (1) All references to stockholders of the corporation shall be deemed to refer to members of the corporation;

> (2) All references to the board of directors of the corporation shall be deemed to refer to the governing body of the corporation;

> (3) All references to directors or to members of the board of directors of the corporation shall be deemed to refer to members of the governing body of the corporation;

> (4) All references to stock, capital stock, or shares thereof of a corporation authorized to issue capital stock shall be deemed to refer to memberships of a nonprofit nonstock corporation and to membership interests of any other nonstock corporation.

For ease of reference and consistency, this opinion adopts the terms used in RMI's governing documents which the parties have used in their briefing.

[15] Bylaws Art. II.

wedded to" and "not legally separated from" a descendant of both Founders.[16]  Class

B, or "Associate," members are individuals who otherwise satisfy the qualifications

for Class A membership, but have not yet reached the age of 35.[17]  Associate

members who are 18 years of age or older and have maintained a primary residence

on the Property for a period of six months immediately prior thereto are eligible for

Regular membership.[18]  Any individual is eligible to be a Class C, or "Honorary,"

member.[19]  Only Regular members have the right to vote at meetings of the

members.[20]

> Under the Bylaws:

> Any individual eligible to be a Regular Member shall automatically
> become a Member of Class A upon delivery of a signed written notice
> to the Secretary of the [Company] substantially as follows:  'Pursuant
> to Article II of the Bylaws. . . , I, _____ [Name of Proposed
> Member], hereby invoke my right to have my name set forth on the
> books of the [Company] as a Regular Member of [RMI].  I affirm that
> I am a descendant of [the Founders].'[21]

The Bylaws further provide that if, after an individual delivers a notice

seeking membership:

---

[16] *Id.* § 1(A).

[17] *Id.* § 1(B).

[18] *Id.* § 1(A).

[19] *Id.* § 1(C).

[20] *Id.* § 3(A)(i).

[21] *Id.* § 2(A).

2

a majority of the Full Board of Directors is not reasonably certain whether such individual is a descendant of [the Founders] and notifies such individual in writing within 60 days after such individual delivers said notice to the Secretary, then such individual shall not be a Member until a majority of the Full Board of Directors is satisfied that such individual is in fact a descendant of [the Founders].[22]

Article IX of the Bylaws provides for the termination and suspension of members, along with the opportunity for reinstatement by vote of the Board. Under Article IX, Section 1 of the Bylaws, automatic termination of membership results upon the occurrence of: (A) a written resignation; (B) death of the member; and (C) divorce or legal separation of a member legally wedded to the descendant of both Founders.[23] Besides providing for automatic termination, Article IX, Section 2 of the Bylaws allows for the termination of membership for cause.[24] The Bylaws require the Board to hold a hearing and provide notice to the person whose membership is being considered for termination.[25] A termination for cause must be approved by at least two-thirds of the members of the Board.[26]

Class A members have the right to "live on the grounds of [RMI] with their spouse and children."[27] In addition, both Class A and Class B members may apply

---

[22] *Id.* § 2(D).

[23] *Id.* Art. IX § 1.

[24] *Id.*

[25] *Id.* § 2.

[26] *Id.*

[27] *Id.* Art. II § 3(A)(iv); Tr. 127:7−9 (Jeffrey Begeman).

3

to the Board for a non-transferable, irrevocable, lifetime license to occupy up to five acres of the Property. The license would entitle the member to exclude others from the designated area and to construct improvements upon it.[28] The Bylaws provide that "all real property, improvements thereon and fixtures thereto shall be and remain the property of the [Company]."[29] At all relevant times, Jeffrey, Laurie, Mystie, Susan, and Terry lived on the Property.[30]

The Bylaws provide that any action requiring member approval may be taken by written consent, without a meeting or prior notice. The consent must:

> set[ ] forth the action so taken, . . . be signed by Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Members having a right to vote thereon were present and voted and shall be delivered to the [Company.] . . . Prompt notice of the taking of such action without a meeting by less than unanimous written consent shall be given to those Members who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents were delivered to the [Company]'s Secretary.[31]

### 2. The Board

The Bylaws provide for a nine-member Board of Directors (the "Board").[32] Directors are elected at the annual meeting of members to one-year terms and hold

---

[28] Bylaws Art. II § 4(B)(i)−(ii).

[29] *Id.* § 4(A).

[30] PTO ¶ 11. *See* Tr. 127:10−128:2 (Jeffrey Begeman).

[31] Bylaws Art. III § 4.

[32] *Id.* Art. V §§ 1−2.

4

office until their successor is elected and qualified.[33] Directors must be at least 18 years of age, but need not be members of RMI.[34] Directors may be removed by a majority vote of the Regular members at a special meeting called for that purpose.[35] "Such removal may be accomplished with or without cause, but the director involved shall be given an opportunity to be present and to be heard at the meeting at which his or her removal is considered."[36]

Annual reports filed in Virginia, along with other documentary evidence, demonstrate that the composition of RMI's Board has changed many times over the years.[37] Minutes and correspondence evidence that the Board has primarily been concerned with the handling of family rifts regarding the rights of RMI's members, litigation, and payment of Company expenses.[38]

---

[33] *Id*. § 2.

[34] *Id*.

[35] *Id*. § 14.

[36] *Id*.

[37] JX 11; JX 16; JX 17; JX 63; JX 64; JX 66.

[38] Tr. 415:10−16. JX 10; JX 11; JX 16; JX 17; JX 18; JX 19; JX 20; JX 21; JX 22; JX 23; JX 24; JX 25; JX 26; JX 27; JX 28; JX 29; JX 30; JX 31; JX 32; JX 33; JX 34; JX 36; JX 37; JX 38; JX 39; JX 42; JX 43; JX 44; JX 45; JX 46; JX 49; JX 50; JX 51; JX 56; JX 58; JX 65; JX 69; JX 71; JX 75; JX 76; JX 77; JX 78; JX 79; JX 90; JX 98; JX 100.

## C.    The March Board

In prior litigation, this court entered an order on March 23, 2017, identifying the composition of RMI's nine-member Board as of that time (the "March Board").[39] The court held that the March Board comprised Bonnie, Jason, Jeffrey, Justin, Laurie, Melanie, Susan, Terry, and Todd.[40]

On April 1, 2017, RMI's then-counsel, Brian Jordan, sent a letter to all members of the March Board (the "April 1 Letter").[41] The April 1 Letter, sent "at the behest" of Jeffrey, Laurie, and Susan, advised the other members of the March Board that a written response to the letter was required "to continue as a director . . . within three days after the letter [was] delivered."[42] Other than Jeffrey, Laurie, and Susan, only Jason responded to the April 1 Letter.[43] On May 2, 2017, Jordan sent another letter to the March Board members, acknowledging either their response or the lack thereof to the April 1 Letter, and giving notice of a meeting of the Board to be held on May 15, 2017.[44] The stated purpose of the meeting was to

---

[39] *See Rainbow Mountain*, 2017 WL 1097143, at *12.

[40] *Id.*

[41] JX 75; PTO ¶¶ 19−20.

[42] *See generally* JX 75 at 2 ("If you do not respond within three days, the Board of Directors will declare the position vacant and schedule a meeting to fill the vacancy.  There is no guarantee you will be reappointed to fill any vacancy.").  PTO ¶ 20; Tr. 11:4−17 (Jordan).

[43] JX 76; JX 77; JX 78; JX 79; Tr. 12:2−13:9 (Jordan).

[44] PTO ¶ 20; JX 87; JX 88.

determine the status of any Board seats vacated by directors and to fill any resulting vacancies.[45]

On April 14, 2017, Terry formally requested a license to occupy the five acres of the Property, including any improvements thereon, which he had used as his residence.[46] The area that Terry occupied included a cabin where he had lived since 2005.[47]

### D. The Notices of Membership and the Written Consent

On May 6, 2017, Cindy sent to RMI's outside counsel a letter enclosing five notices of membership under Article II, Sections (1)(A) and (2)(A) of the Bylaws (the "Notices of Membership").[48] The individuals who had attached their Notices of Membership were Cindy's husband (Roger), her children (Jennifer, Jeremy, and Joshua), and Jeremy's wife (Carly) (together, the "Notifying Individuals").[49] Each of the Notices of Membership was signed, dated, notarized, and indicated that the

---

[45] PTO ¶ 20. *See* JX 87 at 1 ("The purpose of the meeting shall be to declare your directorship vacant and to nominate someone to fill the vacancy."); *id.* at 2 ("The purpose of the meeting shall be to declare other directorships vacant and to nominate new directors.").

[46] JX 80. Tr. 13:10−21 (Jordan); *id.* at 178:10−19 (Jeffrey Begeman); *id.* at 305:9−16 (Susan Begeman).

[47] Tr. 137:5−138:3 (Jeffrey Begeman); *id.* at 326:13−19, 329:23−330:9 (Terry Begeman).

[48] PTO ¶ 21; JX 89 at 1; Tr. 18:18−19:7 (Jordan).

[49] JX 89 at 3−7.

signatory was invoking the right to be a Regular (*i.e.*, voting) member of RMI.[50]

Cindy's letter, which was also notarized, identified the five individuals and their

relationship to Cindy, stated that each was "(35+)", and provided their addresses.[51]

Each of the Notices of Membership took a similar form, closely tracking the

language specified in the Bylaws.[52] For example, the body of Jeremy's notice stated:

> Pursuant to Article II of the Bylaws . . . , I, <u>Jeremy Nichilo</u>, hereby
> invoke my right to have my name set forth on the books of the
> [Company] as a Regular Member of [RMI]. I affirm that I am a
> descendant of [the Founders].[53]

The May 15, 2017, meeting of the March Board proceeded as scheduled (the

"May 15 Meeting"). Prior to that time, the Company had not responded to the

Notices of Membership. Seven individuals—Jason, Jeffrey, Justin, Laurie, Susan,

Terry, and Todd—were present either in person or telephonically for the May 15

Meeting.[54] They determined that two members of the March Board, Bonnie (who

did not participate) and Melanie (who had previously resigned), had vacated their

seats.[55] During the same meeting, Terry presented a document titled "Written

Consent in Lieu of a Special Meeting of the Members of Rainbow Mountain

---

[50] *Id. See* Tr. 21:2−5 (Jordan).

[51] JX 89 at 1. *See* Tr. 19:8−18 (Jordan).

[52] *See* JX 89 at 3−7.

[53] *Id*. at 5. "Jeremy Nichilo" is handwritten.

[54] PTO ¶ 23; JX 90 at 1.

[55] PTO ¶ 23; JX 90 at 2.

3

Incorporated" (the "Written Consent").[56] The Written Consent, which had been executed on the same day, purported to: (1) remove "*without cause*" all members of the March Board and elect a new slate of directors by written consent of a majority of members; (2) appoint a new Board comprising Cindy, Corey Begeman, Emily McGee, Jennifer, Jeremy, Joshua, Mark, Terry, and Todd; (3) amend Article III of the Certificate to remove the reference to the "nonprofit" nature of the corporation; (4) amend and restate Article IX of the Certificate; and (5) terminate Jordan's representation of RMI.[57] The Written Consent had been signed by: (i) Carly, (ii) Cindy, (iii) Jennifer, (iv) Jeremy, (v) Joshua, (vi) Mark, (vii) Roger, (viii) Terry, and (ix) Todd (together with (i)−(viii), the "Consenting Members").[58]

Jordan rejected the Written Consent in a four-page letter to Terry dated May 26, 2017 (the "Consent Rejection Letter").[59] The Consent Rejection Letter recited a litany of supposed defects in the Written Consent. First, Jordan asserted that the Written Consent failed to comply with the prerequisites for calling a special meeting under the Bylaws, which require a written request from either the Board or

---

[56] PTO ¶ 24; JX 90 at 3; JX 91 (the "Written Consent").

[57] Written Consent at 1−7.

[58] *Id*. at 7−15.

[59] JX 92 at 1−2; Tr. 27:7−29:4 (Jordan); *id.* at 385:12−15 (Terry Begeman). Jordan later redated the letter June 1, 2017, and sent it to Terry. JX 94. Other than the date, the only apparent difference between the letters is the inclusion of an address for Terry on the first page of the second version of the letter. *Id.*

4

20% of the voting members.[60]  Second, the members of the Board being removed were not afforded an opportunity to be present and heard at a meeting, as required under Article V, Section 14 of the Bylaws.[61]  Third, the Written Consent did not comply with Article V, Section 3 of the Bylaws, which contemplates that elections of members of the Board occur at a meeting where members, including Class B members, may nominate candidates "from the floor."[62]  Fourth, the Consent Rejection Letter complained that Jennifer, Jeremy, Carly, and Joshua "have not proven their qualifications to be members."[63]  Jordan also declared the Certificate amendment invalid because it had not been proposed by the Board, as required by Section 242(b)(3) of the DGCL.[64]

The Consent Rejection Letter acknowledged Terry's request for a license and stated that it would be forwarded to the Board, along with a recommendation for the Board to hold a meeting to consider the request.[65]  Lastly, the Consent Rejection

---

[60] Consent Rejection Letter at 1.

[61] *Id.* at 1−2.

[62] *Id.* at 2.

[63] *Id.*

[64] *Id.*

[65] *Id.* at 2−3.  Tr. 15:9−23, 26:24−27:6, 29:5−30:6 (Jordan).

Letter listed "dues" Terry owed to the Company in the amount of $1,123.87 and requested payment.[66]

On June 1, 2017, Jordan sent a letter to Cindy rejecting the Notices of Membership (the "Membership Rejection Letter").[67] Jordan claimed that the Notices of Membership did not comply with the Bylaws and that the Notifying Individuals were not properly admitted as members. Jordan wrote:

> [The Notices of Membership] are not sufficient to invoke membership. For example, the Notices [of Membership], although stamped by a Notary, are not affidavits attesting that Jennifer Ray, Jeremy Nichilo, Carly Nichilo, and Joshua Nichilo are over the age of thirty-five or that they provided the various notaries with proof of identity. Also, none of the [n]otaries indicate that any of the persons swore or affirmed to the information contained within the [N]otice [of Membership].[68]

On June 19, 2017, Jordan circulated a written notice to all members of the March Board announcing that a special meeting of the March Board would be held on July 3, 2017.[69] The notice previewed a proposed agenda.[70] The purposes of the

---

[66] Consent Rejection Letter at 3. This amount purported to reflect Terry's unpaid share of real estate taxes, Virginia State Corporation Commission fees, Delaware franchise taxes, and registered agent fees from 2008 through 2015. *Id.*

[67] JX 93 ("Membership Rejection Letter"); *see* Tr. 21:6−8, 65:11−68:4 (Jordan).

[68] *Id.* at 1.

[69] JX 96. Tr. 189:6−16 (Jeffrey Begeman). *See also* JX 95 (including a prior notice, which was later revised).

[70] JX 96.

special meeting were to fill the two vacancies that the March Board had identified at the May 15 Meeting and to terminate Terry's Class A membership for cause.[71]

### E. The July 3 Special Meeting

On July 3, 2017, Laurie, Jason, Jeffrey, and Susan convened as an ostensible majority of the Board in accordance with Jordan's June 19, 2017, notice (the "July 3 Special Meeting").[72] The minutes of the meeting list Justin, Terry, and Todd as absent directors.[73] The minutes indicate that Laurie, Jason, Jeffrey, and Susan selected Jeff Cash and Dhyani Simonini to fill the two vacancies on the Board that had been declared at the May 15 Meeting.[74] Thereafter, the purported six-person majority of the Board unanimously adopted a resolution terminating Terry's membership.[75] The resolution cited multiple grounds for Terry's removal, including filing a lawsuit against the Company and threatening its existence, as well as engaging in unauthorized residential use of the Property.[76]

---

[71] *Id.* at 1−2.

[72] JX 98 at 1; Tr. 190:24−191:3 (Jeffrey Begeman).

[73] *See* JX 98 at 1. Tr. 35:9−19 (Jordan); *id.* at 191:4−6 (Jeffrey Begeman). Terry asserts that he never received notice of the July 3 Special Meeting. Tr. 388:20−23 (Terry Begeman).

[74] JX 98 at 1; Tr. 192:15−18 (Jeffrey Begeman).

[75] JX 98 at 2; Tr. 193:2−19 (Jeffrey Begeman).

[76] JX 98 at 2; Tr. 149:12−150:22, 193:20−197:20 (Jeffrey Begeman).

The meeting participants also discussed the Notices of Membership and the Membership Rejection Letter.[77] The minutes reflect that Jordan had returned the Notices of Membership to Cindy on the grounds that the notarizations did not expressly state that valid identification had been presented at the time of signing, and that Carly had not provided a copy of her marriage license to confirm that she was currently wedded to Jeremy.[78] The discussion then turned to the Notifying Individuals' involvement in Terry's effort to gain control of the Company.[79] Although the participants acknowledged that the Bylaws provide for automatic membership upon the submission of a compliant written notice, they nevertheless questioned whether the Board could exercise discretion to deny membership.[80] The group resolved to seek legal advice from Jordan as to whether this discretion could be exercised under the governing documents.[81]

The participants also resolved to remove Terry and Todd as officers of the Company.[82] Terry's request for a license to continue occupying five acres on the Property was declared to be "a non-issue" in light of "the unanimous vote of the six

---

[77] JX 98 at 3.

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Id.* RMI did not argue at trial that the Board has discretion to deny Class A membership to an individual who otherwise qualifies for membership.

[82] JX 98 at 3.

directors in attendance to terminate his membership."[83]  Separately, the July 3 Special Meeting participants "accepted requests for Membership" from Jason, Justin, Mystie, Susan, and Rebecca Begeman.[84]

### F.    Procedural History

On June 4, 2018, RMI filed a complaint against Terry, seeking an order declaring that:  (1) Terry's membership in RMI was terminated for cause at the July 3 Special Meeting; (2) Terry is no longer a member of RMI; (3) Terry is not entitled to occupy or enjoy the Property; (4) the cabin on the Propriety was never intended to exist for Terry's exclusive benefit; and (5) Terry owes unpaid membership dues and related taxes and expenses to RMI.[85]

On November 9, 2018, Terry, who has proceeded *pro se* throughout this litigation, filed a verified answer and consolidated affirmative defense and a verified counterclaim for declaratory judgment (the "Counterclaim") against RMI and the following eighteen individuals:  Bonnie, Carly, Cindy, Corey, Emily, Jason, Jeffrey, Jennifer, Jeremy, Joshua, Justin, Laurie, Mark, Melanie, Mystie, Roger, Susan, and Todd (together, the "Third-Party Defendants").[86]  The Counterclaim seeks

---

[83] *Id.*

[84] *Id.* at 2; Tr. 99:20−100:8 (Jordan); *see id.* at 303:6−18 (Susan Begeman) (explaining that her membership request was to "[m]ak[e] sure [she] was still considered a member").

[85] Dkt. 1.

[86] Dkt. 16; *see* Counterclaim.

declaratory judgment concerning the membership and directorship status of various Third-Party Defendants, the validity of corporate actions, Terry's entitlement to a license, the intended private use of the Property, and the reimbursement of litigation expenses.[87]  On January 25, 2019, RMI answered the Counterclaim.[88]

On January 30, 2019, the Defendant filed a reply to Plaintiff counsel's motion to withdraw and to Plaintiff's motion to stay, a portion of which appeared to request a default judgment against RMI and sixteen of the eighteen Third-Party Defendants (the "Motion for Default Judgment").[89]

From February 7, 2019, to August 6, 2019, five of the Third-Party Defendants—Laurie, Jason, Jeffrey, Mystie, and Susan (together the "Answering Third-Party Defendants")—filed answers to the Counterclaim.[90]  On February 13, 2019, Terry filed a motion to correct the Court of Chancery record and motion for an additional default judgment, a portion of which requested a default judgment against seventeen of the eighteen Third-Party Defendants (the "Motion to Correct").[91]  On July 23, 2019, Terry filed a motion to set aside a default judgment

---

[87] Counterclaim ¶¶ 102−119.

[88] Dkt. 28.

[89] Dkt. 35.

[90] Dkts. 44, 60, 64, 70, 95.

[91] Dkt. 55.

or, in the alternative, a motion to dismiss (the "Motion to Dismiss").[92]  The Motion to Dismiss argued that Terry neither received nor waived notice of the July 3 Special Meeting, and did not approve the meeting minutes, rendering the meeting procedurally defective.[93]  It further contended that the purported termination of Terry's membership for cause was pretextual and premised on false and unsupported allegations.[94]  On December 5, 2019, the court entered an order denying the Motion to Dismiss.[95]  That same day, the court entered an order:  (1) partially denying the Motion for Default Judgment against RMI and the Answering Third-Party Defendants; (2) partially granting the Motion for Default Judgment against Bonnie, Carly, Cindy, Corey, Emily, Jennifer, Jeremy, Joshua, Justin, Mark, Melanie, Roger, and Todd (together the "Non-Answering Third-Party Defendants"); and (3) declaring that the granting of the Motion for Default Judgment against the Non-Answering Third-Party Defendants "will have no binding or preclusive effect on the litigation between RMI, Terry, and the Answering Third-Party Defendants."[96]

---

[92] Dkt. 86.

[93] *Id*. ¶¶ 29−31.

[94] *Id*. ¶¶ 32−40.

[95] Dkt. 142.

[96] Dkt. 141.

11

After denying cross-motions for summary judgment, the court conducted a two-day trial in October 2022.[97] Terry seeks a declaration that: (1) the purported termination of his membership is void; (2) he remains a member, director, and officer of RMI; (3) the Written Consent validly removed the March Board, installed a new Board, and amended the Certificate; (4) the Membership Rejection Letter was invalid and, hence, that the Notifying Individuals became valid Class A members as of May 6, 2017; and (5) Terry is entitled to continue residing in the cabin.[98] Finally,

---

[97] Dkts. 307−09. None of the parties was intent on seeking a summary adjudication of this matter. The original complaint was filed almost a year after Terry's purported removal as a member of RMI and was not accompanied by a motion to expedite. The procedural timeline of this case reflects a series of delays caused by pandemic-related challenges, scheduling disputes, countless motions (including, for example, Terry's motion to disqualify RMI's counsel), and post-trial developments. On July 14, 2020, the parties jointly requested an extension of the case schedule due to Terry's lack of internet access, inability to use public computers, and challenges related to document production stemming from the COVID-19 pandemic. *See* Dkt. 185. In February 2021, counsel for RMI advised the court that it was attempting to cancel the trial dates, believing the case would be resolved on summary judgment and noting that Terry had ceased communicating since approximately September 2020. *See* Dkt. 241. On February 17, 2021, the court scheduled a status conference. *See* Dkt. 242. The scheduling order was vacated, and trial dates were stayed following the March 8, 2021, status conference. *See* Dkts. 248–49. In October 2021, RMI informed the court that efforts to engage Terry in mediation had been unsuccessful. *See* Dkt. 261. On May 11, 2022, the court held another status conference and directed the parties to confer on new trial dates. *See* Dkt. 273. Trial was then rescheduled for October 17–18, 2022. *See* Dkt. 283. Following trial, the parties engaged in extended settlement discussions. *See* Dkts. 311−12. The court later granted a scheduling order for post-trial briefing. *See* Dkt. 314. At the parties' request, the post-trial oral argument was postponed. *See* Dkt. 364. The argument ultimately took place by telephonic conference after an initial Zoom session on April 9, 2025, was suspended due to Terry's unstable wireless internet connection from the basement of a public library in Virginia. *See* Dkt. 367.

[98] PTO at 26−32.

12

Terry seeks reimbursement of legal fees advanced in separate actions in the amount of either $12,331.75, as itemized litigation expenses, or $18,724.11, as one-half of the Company's net legal fees.[99]

On May 8, 2024, Terry filed a post-trial motion in limine ("Motion in Limine") and a motion to enter new evidence ("Motion to Enter New Evidence").[100] On August 28, 2024, the court granted in part the Motion in Limine and denied the Motion to Enter New Evidence.[101] Post-trial oral argument was presented on April 10 and 11, 2025.

## II. ANALYSIS

### A. The Validity of the Notices of Membership and Board Changes in 2017

As noted above, RMI is a Delaware nonstock corporation governed by the DGCL, as translated under Section 114(a). Section 225 of the DGCL is the statutory mechanism for resolving disputes over the appointment, election, and removal of officers and directors of Delaware corporations. When translated for nonstock corporations, Section 225(a) provides: "Upon application of any [member] . . . the Court of Chancery may hear and determine the validity of any election, appointment, removal or resignation of any [member of the governing body] of any

---

[99] *Id*. at 32 ¶ 20.

[100] Dkt. 350.

[101] Dkts. 354−55.

13

corporation . . . "  8 *Del. C.* § 225(a); *see* Donald J. Wolfe, Jr. & Michael A. Pittenger, *1 Corporate and Commercial Practice in the Delaware Court of Chancery* § 9.09[c] (2024) ("Section 114 of the DGCL makes Section 225 applicable to nonstock corporations and provides that references to 'directors' shall also include the governing body of a nonstock corporation and that references to 'stockholders' shall include members of a nonstock corporation.").[102]  In a Section 225 action,

---

[102] RMI argues that Terry lacks standing to litigate the membership rights of the Notifying Individuals.  *See* Pl.'s Post-Trial Opening Br. 28.  RMI maintains that Terry cannot advocate for their admission as members or rely on their status to support the validity of the Written Consent. *See* Pl.'s Post-Trial Answering Br. 25−27.  RMI's standing argument is merely a reformulation of its contention rejected in the 2017 action that Terry was equitably estopped to litigate Cindy and Mark's Class A membership status, because they were not parties to the action. *See Rainbow Mountain*, 2017 WL 1097143, at *12.  RMI's argument was without merit then and is without merit now.  "[A]ny party with statutory standing can litigate the validity of the exercise of voting rights, even if they are not the party that exercised the voting rights or would benefit from a favorable determination." *Hawk Inv. Hldgs. Ltd. v. Stream TV Networks, Inc.*, 2022 WL 17258460, at *8 (Del. Ch. Nov. 29, 2022); *see In re Hawk Sys., Inc.*, 2019 WL 4187452, at *6 (Del. Ch. Sept. 4, 2019) ("[T]he Court is empowered to determine the right and power of persons claiming to [hold a membership] and . . . to vote at any meeting of . . . members.") (citation modified) (quoting 8 *Del. C.* § 227 )), *aff'd sub nom. Spanakos v. Pate*, 237 A.3d 809 (Del. 2020). Terry, as a member of RMI, has statutory standing to pursue this Section 225 proceeding. Therefore, he also has standing to litigate the exercise of voting rights by each individual who executed the Written Consent, *i.e.*, the five individuals whose voting rights are premised upon the validity of the Notices of Membership. *See Byrne v. Lord*, 1996 WL 361503, at *2 (Del. Ch. June 11, 1996) (observing that in determining who has the right to vote stock in the context of a Section 225 proceeding, the court should also determine who owns it, but a question of ownership "is not binding on the owner unless the owner is served with process and made a part of the Section 225 proceeding"); *Zohar II 2005-1, Ltd. v. FSAR Hldgs., Inc.*, 2017 WL 5956877, at *24–26 (Del. Ch. Nov. 30, 2017) (analyzing the history of Section 225 case law and the court's authority to determine stock ownership in a Section 225 proceeding).  It is also of note that each of the Notifying Individuals is a party to the action.  None of them appeared to challenge Terry's counterclaim that they are members of RMI, resulting in a default judgment against them. Dkt. 141 ¶¶ 2, 9.  RMI's

14

"[t]he Court exercises jurisdiction 'only for the limited purpose of determining the corporation's *de jure* directors.'" *Hockessin*, 59 A.3d at 453 (citing *Genger v. TR Invs., LLC,* 26 A.3d 180, 200 (Del. 2011)).

Section 225(b) of the DGCL, as translated, also allows the Court of Chancery to "hear and determine the result of any vote of [members] upon matters other than the election of [the governing body of the corporation]." 8 *Del. C.* § 225(b). Yet,

> the scope of a Section 225 action is narrow and is limited to determining those issues that pertain to the validity of actions to elect or remove a director or officer or the results of a stockholder vote under Section 225(b). So a Section 225 action is an improper vehicle for trying purely collateral issues, issues of director misconduct or other breaches of fiduciary duty. A claim is 'purely collateral' if resolution of the claim does not help the Court decide the proper composition of the board of directors or management team or the validity of a stockholder vote.

*Nazarian v. Sassouni*, 2025 WL 1913182, at *7 (Del. Ch. July 11, 2025) (citation omitted).

### 1. The validity of the Notices of Membership

This case largely turns on the validity of the Written Consent that purported to remove and replace directors at the May 15 Meeting. If the Written Consent is

---

argument that any claims concerning the membership rights of the Notifying Individuals are time-barred is equally without merit. The claims in this case were brought well within the analogous three-year statute of limitations, and RMI makes no effort to establish laches. In that regard, it is notable that RMI did not assert its claims until more than a year after the May 15 Meeting and almost a year after the July 3 Special Meeting.

valid, then Jeffrey, Susan, Jason, and Laurie were no longer directors on July 3, 2017, when they purported to hold a meeting of the Board and to terminate Terry's membership. The validity of the Written Consent depends upon whether the persons signing the consent constituted a majority of the Class A members of RMI.

Based upon the Company's list of members as of 2016 and the court's decision in March 2017, the following nine individuals were Class A members as of May 15, 2017: Laurie, Jason, Jeffrey, Justin, Susan, Todd, Terry, Cindy, and Mark.[103] The central issue in this case is whether the five Notifying Individuals became valid Class A members of RMI prior to the May 15 Meeting. The Plaintiff concedes that if the five Notices of Membership are valid, then the nine persons executing the Written Consent constituted a majority of the Class A members with the power to remove and replace the March Board immediately before the May 15 Meeting.[104]

---

[103] *See* JX 70 (identifying Laurie, Jason, Jeffrey, Justin, Susan, and Todd as Class A members as of June 8, 2016); *Rainbow Mountain*, 2017 WL 1097143, at *9, *12 (holding that "[t]he board's attempt to terminate Mark and Cindy as members of Rainbow Mountain [in 2005] was not effective" and that "Terry remains a Regular [m]ember of Rainbow Mountain"); *see* Pl.'s Post-Trial Opening Br. 16 (acknowledging that Laurie, Jason, Jeffrey, Justin, Susan, Todd, Terry, Mark, and Cindy were "members as of the events at issue in 2017").

[104] *See* Telephonic Oral Argument and Rulings of the Court on Cross-Motions for Summary Judgment and Renewed Motion for Sanctions (Del. Ch. May 3, 2021) (Dkt. 253) at 17:13−16 (Plaintiff's counsel: "I would agree that if those five membership applications were valid, then the numbers work out that that group of signatures [on the Written Consent] would have the required majority.").

### a. The Notices of Membership were valid.

To qualify as a Class A member, an individual must be (i) at least 35 years of age and (ii) either a descendant of the Founders or "lawfully wedded to" and "not legally separated from" a descendant of the Founders.[105] One does not "apply" for Class A membership. Rather, a person who meets the eligibility qualifications "shall automatically become a [m]ember of Class A upon delivery of a signed written notice" that invokes the individual's right to be a Class A member and affirms that the individual is a descendant of the Founders.[106] Nothing more is required. The Bylaws do not require approval by the Board for the admission of Class A members. There is, however, one instance that could delay a person's Class A membership *if* a "majority of the Full Board of Directors is not reasonably certain whether such individual is a descendant of [the Founders]."[107] In that event, the Board must notify the individual in writing within 60 days of delivery of the membership notice. If the Board notifies the individual within the 60-day period, then the person "shall not be a Member until a majority of the Full Board of Directors is satisfied that such individual is in fact a descendant of [the Founders]."[108]

---

[105] Bylaws Art. II § 1(A).

[106] *Id.* § 2(A).

[107] *Id.* § 2(D).

[108] *Id.*

The five Notices of Membership were executed and notarized between April 4 and 6, 2017, and delivered to the Company's counsel on May 10, 2017.[109] The Notices of Membership were precisely in the form prescribed by the Bylaws.[110] Three of the five Notices of Membership affirmed that the individual was a descendant of the Founders,[111] and the other two stated that the individual is "the legally and lawfully wedded spouse of a descendant of [the Founders]."[112] The Notices of Membership supplied all of the information that was required under the Bylaws.

On their face, the Notices of Membership were valid and complied with the Bylaws. Therefore, each of the five Notifying Individuals would automatically become Class A members unless a majority of the March Board (1) was not reasonably certain of a Notifying Individual's eligibility for Class A membership *and* (2) took action within 60 days under Article II, Section 2(D) of the Bylaws to require any of the Notifying Individuals to provide proof of eligibility. In that event, a proper and timely notification questioning eligibility would delay automatic membership until the Notifying Individuals provided sufficient information to

---

[109] JX 89. Plaintiff does not argue that delivery of the Notices of Membership to Jordan, the Company's counsel, was defective.

[110] *Compare* JX 89 at 3−7, *with* Bylaws Art. II § 2(A).

[111] JX 89 at 4−5, 7.

[112] *Id*. at 3, 6.

18

resolve any reasonable uncertainty among a majority of the Board. Although RMI tries to rely on Jordan's June 1, 2017, Membership Rejection Letter as a basis for denying automatic membership to the Notifying Individuals, it does not fill the bill.

None of the parties in this litigation contends that any of the Notifying Individuals lacked the qualifications for Class A membership as of the date that the Notices of Membership were delivered to the Company's counsel. Rather, RMI and those aligned against Terry contend that the Company's counsel was justified in rejecting the notices because he questioned the Notifying Individuals' qualifications and identified supposed defects in the Notices of Membership. Jordan's perceived defects, which he articulated in the Membership Rejection Letter, did not then and do not now invalidate any of the Notices of Membership.

The Membership Rejection Letter itemized several contrived, hyper-technical deficiencies, such as the absence of sworn affidavits attesting that Jennifer, Jeremy, Carly, or Joshua were over the age of 35, or evidence of their having provided proof of identity to the notary.[113] None of these alleged deficiencies is grounded in the Certificate, the Bylaws, or the DGCL.[114] Article II, Section 2(A) of the Bylaws requires only that a notice be signed and delivered, and that it affirm the individual's

---

[113] *See* Membership Rejection Letter at 1.

[114] *See* Def.'s Post-Trial Opening Br. 4−5; Def.'s Post-Trial Reply Br. 3−4, 14−21.

descent from the Founders.[115] There is no requirement that the notice be notarized or accompanied by an affidavit.[116] Nor do the Bylaws confer upon RMI's legal counsel the unilateral authority to determine the sufficiency of the membership notices or to reject them.[117] The Bylaws reserve that determination to a "Majority of the Full Board."[118] The Membership Rejection Letter does not indicate that a majority of the Board was not reasonably certain that any of the Notifying Individuals were descendants of the Founders or, in the case of Roger and Carly, that they were currently married to and not legally separated from a descendant.[119] In fact, the Membership Rejection Letter does not even indicate that Jordan himself was not reasonably certain as to the Notifying Individuals' relationship to the Founders or a descendant of the Founders.[120] Rather, it is unmistakable that the Membership Rejection Letter's *post hoc* objections were part of a desperate attempt to undermine the validity and effectiveness of the Written Consent that was presented two weeks earlier at the May 15 Meeting.

---

[115] Bylaws Art. II § 2(A).

[116] *Id.*

[117] *Cf. id*. § 2(D).

[118] *Id.*

[119] Membership Rejection Letter at 1.

[120] *Id.* The Membership Rejection Letter was sent only to Cindy. It was not sent to any of the Notifying Individuals whose notices were being rejected. *Id.*

There is no evidence in the record that a majority of the March Board was not reasonably certain that any of the Notifying Individuals did not qualify for Class A membership. Nor is there any evidence that a majority of the March Board attempted to articulate any uncertainty through a notice in conformity with the Bylaws. If there were any lingering doubt, one need only review the minutes of the rump Board meeting on July 3, 2017.[121] This is the only evidence of any discussion by the removed members of the March Board about the Notices of Membership. The minutes confirm that the attendees had no issue with Roger's membership qualifications. The minutes also specifically state that the other four Notifying Individuals had "celebrated their 35th birthdays several years ago."[122] None of the attendees at the July 3 Special Meeting questioned whether Jeremy, Jennifer, and Joshua were descendants of the Founders or whether Carly was currently married to Jeremy.[123] Indeed, the minutes tacitly admit that each of the individuals had satisfied the requirements for Class A membership and that membership was automatic under the Bylaws. Instead, the minutes betray a desperate lament that the Board "*should*

---

[121] *See* JX 98 at 3.

[122] *Id.*

[123] *Id.* Instead, the minutes only criticize Carly's notice for not having submitted a "copy of the marriage license indicating that Carly Begeman is lawfully wedded to Jeremy Nichilo." *Id.*

21

have the power to deny anyone membership,"[124] even though the Certificate, Bylaws, and DGCL do not so provide.

Each of the five Notifying Individuals became Class A members of RMI automatically upon delivery of the Notices of Membership pursuant to Article II, Section 2(A) of the Bylaws.[125] Hence, as of the May 10, 2017, submission of Notices of Membership,[126] the list of Class A members comprised the following 14 individuals: Carly, Cindy, Laurie, Jason, Jeffrey, Jennifer, Jeremy, Joshua, Justin, Mark, Roger, Susan, Terry, and Todd.

## 2. The validity of the Written Consent

The court next considers the validity and effectiveness of the Written Consent. The Written Consent purported to remove the March Board and to replace it with a new slate of directors. Section 141(k) of the DGCL, which applies to nonstock corporations via Section 141(j), allows for the removal of members of the governing body. It states, in pertinent part, as translated through Section 141(j):

> Any [member of the governing body of the corporation] may be removed, with or without cause, by the holders of a majority of the [memberships] then entitled to vote at an election of the [members of the governing body of the corporation] . . . [u]nless the certificate of incorporation otherwise provides [for a classified governing body, in

---

[124] *Id.* (emphasis in original). *Contra* Bylaws Art. II § 2(A), § 2(D).

[125] Bylaws Art. II §2(A). *See* Def.'s Post-Trial Opening Br. 10−11, 17−18.

[126] *See* JX 89 at 2.

which case, the members of the corporation] may effect such removal only for cause.[127]

The Bylaws also allow for the removal of members of the Board "with or without cause, at any time, by the majority vote of the Regular [m]embers at a special meeting called for that purpose."[128]  But that is not the only process through which members may remove RMI directors.  Both the DGCL and the Bylaws allow for member action by written consent without a meeting.  Section 228(b) of the DGCL states:

> Unless otherwise provided in the certificate of incorporation, any action required by this chapter to be taken at a meeting of the members of a nonstock corporation, or any action which may be taken at any meeting of the members of a nonstock corporation, may be taken without a meeting, without prior notice and without a vote, if a consent or consents, setting forth the action so taken, shall be signed by members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all members having a right to vote thereon were present and voted and shall be delivered to the corporation in the manner required by this section.[129]

The Certificate does not restrict action by member written consent, and RMI does not contend that directors may not be removed by member written consent.[130]

---

[127] 8 *Del. C.* § 141(k)(1).

[128] Bylaws Art. V § 14.

[129] 8 *Del. C.* § 228(b).  The Bylaws contain nearly identical language.  *See* Bylaws Art. III § 4.

[130] Notably, the Consent Rejection Letter asserted that members of the Board could only be removed at a special meeting of members, suggesting that directors could not be

23

Terry presented the Written Consent at a meeting of the March Board held on May 15, 2017—the same date on which the Written Consent had been executed.[131] The Written Consent was signed by nine Class A members and purported to remove all existing directors of the March Board without cause and to elect a new Board.[132] *See Unanue v. Unanue*, 2004 WL 2521292, at \*7 (Del. Ch. Nov. 3, 2004) ("It is well settled that the holders of a majority of a company's stock may remove a director

---

removed by written consent. JX 92 at 1−2. But RMI did not assert that argument at trial, nor does it press the position advanced in the Consent Rejection Letter that the consent was ineffective because the ousted directors were not afforded an opportunity to be heard at a meeting—a position inconsistent with the members' absolute right to act by written consent. RMI does not have a classified board, which would permit removal of a director only for cause and provide for an opportunity to be heard. *See* 8 *Del. C.* § 141(k). *Hockessin*, 59 A.3d at 464 (holding that the purported removal of members of a classified board of a nonstock corporation was invalid, including for failure to provide an opportunity to be heard). Enforcement of a right to be heard as expressed in the Bylaws would undermine the members' right to remove directors by written consent. *See Allen v. Prime Computer, Inc.*, 540 A.2d 417, 420 (Del. 1988) ("As § 228(a) makes clear, the exercise of the right to act immediately by majority written consent may be modified or eliminated only by the certificate of incorporation. Thus, bylaws which effectively abrogate the exercise of this right are invalid."); *Empire of Carolina, Inc. v. Deltona Corp.*, 514 A.2d 1091, 1096 (Del. 1985) ("Section 228 contains no language suggesting that action accomplished by shareholders through written consent may be lawfully deferred or thwarted on grounds not related to the legal sufficiency of the consents obtained."). Although the Delaware Supreme Court has recognized that "a bylaw which imposed minimal essential provisions for ministerial review of the validity of the action taken by shareholder consent would serve the purposes of § 228," *Allen*, 540 A.2d at 420, Article V, Section 14 of the Bylaws is not so limited. In any event, the Written Consent expressly provided an opportunity for the removed directors to be heard. *See* Written Consent at 1 (stating that "all [removed] directors shall be given a chance to be heard during the May 15, 2017 Meeting . . . as well as be given until June 28, 2017, pursuant to Article V, § 14 of the Bylaws, to respond in writing to all [m]embers entitled to vote on the subject matter, so as to be heard").

[131] *See* Written Consent at 7−15; JX 90 at 3. Def.'s Post-Trial Opening Br. 36−37.

[132] *See* Written Consent at 1−2, 7−15.

24

with or without cause."). The nine individuals who signed the Written Consent were Class A members entitled to vote as of May 15, 2017.[133] Those nine individuals constituted a majority of the members entitled to vote.[134] Accordingly, the Written Consent satisfied the voting threshold required to remove the March Board and to elect new members of the RMI Board.

A written consent may provide that it becomes effective at a future date. *See* 8 *Del. C.* 228(c) ("Any person executing a consent may provide . . . that such consent will be effective at a future time, . . . occurring not later than 60 days after . . . such provision is made, if evidence of the . . . provision is provided to the corporation."). The Written Consent indicated that it was to become effective on June 28, 2017, which was within 60 days of the execution of the Written Consent.[135] Accordingly, the Written Consent, which was executed by a majority of the Class A

---

[133] Written Consent at 7−15.

[134] Terry argues that Susan, Justin, and Jason are not Class A members because their memberships automatically expired in 2009. This opinion does not need to reach that issue because the nine signatories to the Written Consent constituted a majority of the Class A members regardless of Susan, Justin, and Jason's status in 2017.

[135] Written Consent at 2. It appears that June 28 may have been chosen, in part, because that was the date upon which Corey turned 18 years old, the minimum age for serving as a member of the Board. *See* Bylaws Art. V § 2; Tr. 373:4 (Terry Begeman) ("June 28. And that was Corey's birthday."). Following the May 15, 2017, meeting, a tenth name—Justin—was handwritten at the bottom of the list of new members of the Board. Tr. 88:14−21 (Jordan). At trial, Terry testified that the handwritten addition of Justin's name occurred after the Consenting Members had signed the document and the May 15 Meeting and was later delivered to RMI's registered agent. *See id.* 373:6−9 (Terry Begeman). The subsequent effort to include Justin as a new member of the Board was ineffective because there is no evidence that the Consenting Members ever approved it.

25

members, satisfied all procedural requirements under Section 228 of the DGCL. Therefore, on June 28, 2017, the March Board was removed and replaced with Cindy, Corey, Emily, Jennifer, Jeremy, Joshua, Mark, Terry, and Todd.

### 3. The purported amendment of the Certificate

The Written Consent purported to amend the RMI Certificate in several respects. Most critical was amending Article III to change RMI from a "nonstock nonprofit corporation" to a "nonstock corporation."[136] "A 'charitable nonstock corporation' is any nonprofit nonstock corporation that is exempt from taxation under [Section] 501(c)(3) of the United States Internal Revenue Code, or any successor provisions." 8 *Del. C.* § 114(d)(1). "A 'nonstock corporation' is any corporation organized under this chapter that is not authorized to issue capital stock." 8 *Del. C.* § 114(d)(4). "A 'nonprofit nonstock corporation' is a nonstock corporation that does not have membership interests." 8 *Del. C.* § 114(d)(3). "A 'membership interest' is, unless otherwise provided in a nonstock corporation's certificate of incorporation, a member's share of the profits and losses of a nonstock corporation, or a member's right to receive distributions of the nonstock corporation's assets, or both." 8 *Del. C.* § 114(d)(2).[137]

---

[136] Written Consent at 3.

[137] The parties dispute whether RMI is currently a nonprofit corporation. *See* JX 103 (documentation filed with the Commonwealth of Virginia in 2020 for registration as a charitable organization); Tr. 376:3−8 (Terry Begeman); *id*. at 399:9−17 ("Now, my

26

The purported amendment to the RMI Certificate was ineffective. This attempted amendment failed as a matter of Delaware law and the Company's governing documents. For nonstock corporations, Section 242 of the DGCL requires that:

> [e]very amendment authorized by subsection (a) of this section shall be made and effected in the following manner:
>
> * * *
>
> If the corporation is a nonstock corporation, then the *governing body* thereof shall adopt a resolution setting forth the amendment proposed and declaring its advisability. If a *majority of all the members of the governing body* shall vote in favor of such amendment, a certificate thereof shall be executed, acknowledged and filed and shall become effective in accordance with [Section] 103 of this title.

8 *Del. C.* § 242(b)(3). Unlike the statutory framework for amending the certificate of stock corporations, "an amendment to the certificate of incorporation of a nonstock corporation must only be approved by a majority of all members of its governing body." *New Day*, 66 Bus. Law. at 304. The DGCL does not contemplate

---

mother, she intended it to be more along the lines of an educational center, with her work. She was a self-proclaimed psychic. She did work with clients, hypnosis, trying to help them with eating disorders and sexual abuse and things like that in their childhood. And she had a good heart and wanted to do well. And that is what I have supported all along, in prior litigation and in this litigation, the educational purpose of this corporation."); *id.* at 410:21−411:14; *see also* Post-Trial Argument Tr. Vol. II at 49. The court need not and does not resolve that dispute here in this Section 225 action. *See Adlerstein v. Wertheimer*, 2002 WL 205684, at *7 (Del. Ch. Jan. 25, 2002) ("Because it is summary in nature, a Section 225 proceeding is limited to those issues that must necessarily be considered in order to resolve a disputed corporate election process.").

a vote of the members to amend the certificate "unless the certificate of incorporation expressly requires such a vote." *Id.*

The Written Consent was an act of a majority of RMI's members, not its Board. The Certificate does not afford members any right to vote on amendments to the Certificate, let alone the unilateral right to effect an amendment without Board approval. Rather, Article XI states that: "The corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate . . . in the manner now or hereafter prescribed by the Statute, and all rights conferred upon members herein are granted subject to this reservation."[138] The Statute— Section 242(b)(3) of the DGCL—reserves to the governing body (*i.e.*, the RMI Board) the exclusive right to amend the Certificate. Article VII of the Certificate, which provides that "[t]he activities and affairs of the corporation shall be managed by a board of directors,"[139] aligns with Delaware's broader statutory mandate that "[t]he business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors." 8 *Del. C.* § 141(a).

The Written Consent attempts to sidestep this structure. It states that "the Members hereby reserve the right to amend" the Certificate, invoking Article XI of

---

[138] Certificate Art. XI.

[139] *Id.* Art. VII.

the Certificate as justification.[140]  But Terry and the Written Consent misread the Certificate.  The Certificate does not grant the members any reserved right to amend the Certificate; it reserves that right to the Company itself, acting through its Board and in accordance with Section 242 of the DGCL.[141]  The Written Consent contains no resolution of the Board recommending the amendment or declaring its advisability.[142]  There is no evidence that the Board considered or approved the amendment at any duly noticed Board meeting.

It is also of no moment that six of the members who executed the Written Consent would ultimately constitute a majority of the Board on June 28, 2017.  *See AGR Halifax Fund, Inc. v. Fiscina*, 743 A.2d 1188, 1192–93 (Del. Ch. 1999) (finding an amendment to a certificate invalid from its inception because the individuals, who were not yet elected to the board of directors, lacked the statutory authority under 8 *Del. C.* § 141(a) to approve an amendment that had not yet been proposed by the board, as required under 8 *Del. C.* § 242(b)).  Thus, even if some of the members who executed the Written Consent would eventually become a majority of the Board, they lacked authority to act as the RMI Board at the time of the Written

---

[140] Written Consent at 3; Certificate Art. XI.

[141] *See* Certificate Art. XI; 8 *Del. C.* § 242(b)(3).

[142] *Cf.* Written Consent.

Consent to amend the Certificate. Accordingly, the purported Certificate amendment is ineffective.[143]

### 4. The July 3 resolution terminating Terry's membership was invalid.

On July 3, 2017, Jason, Jeffrey, Laurie, and Susan convened a supposed special meeting of the Board, at which they purported to fill two director vacancies and to terminate Terry's membership for cause.[144] Terry disputes the grounds for his purported removal and argues that he never received notice of the July 3 Meeting.[145]

The court need not decide whether there was sufficient cause to terminate Terry's membership or whether he received adequate notice of the meeting because the group that purported to terminate Terry's membership on July 3, 2017, lacked the authority to do so. Jason, Jeffrey, Laurie, and Susan had been validly removed as directors by operation of the Written Consent, which became effective on June 28, 2017.[146] Thus, as of that date, Jason, Jeffrey, Laurie, and Susan no longer held office as directors and could not take corporate actions, such as appointing Cash and

---

[143] The Certificate amendment is invalid because it was not adopted by the RMI Board. Therefore, the court need not reach RMI's alternative argument that it was invalid because Terry violated his duties as a member and director of a nonprofit corporation. *See* Pl.'s Post-Trial Opening Br. 34−35; Pl.'s Post-Trial Reply Br. 35−42.

[144] JX 98.

[145] Def.'s Post-Trial Opening Br. 55, 59−63, 66−71; Def.'s Post-Trial Reply Br. 8−9.

[146] *Cf.* Written Consent at 1.

Simonini to fill Board vacancies or terminating Terry's membership. The resolution purporting to terminate Terry's membership and position as an officer was, therefore, without legal effect.[147] Accordingly, Terry was not validly removed as a member or officer of RMI on July 3, 2017.

## B. Annual Meeting of Members

Article V, Section 2 of the Bylaws requires the annual election of members of the Board. *See* Bylaws Art. V § 2 ("Directors shall be elected at the annual meeting of [m]embers, and the term of office of each director shall be until the next annual meeting of [m]embers and the election and qualification of his or her successor."). Due to the ongoing dispute and constant delays in this case, fueled in part by the court's hope and encouragement that the parties might resolve this matter, there has been no meeting to elect directors since 2017. It is time for a meeting of the RMI members to elect the members of the Board and to decide the Company's future.

Section 215(d) of the DGCL provides:

> If the election of the governing body of any nonstock corporation shall not be held on the day designated by the bylaws, the governing body shall cause the election to be held as soon thereafter as convenient. The failure to hold such an election at the designated time shall not work any forfeiture or dissolution of the corporation, but the Court of Chancery may summarily order such an election to be held upon the application of any member of the corporation. At any election pursuant to such order the persons entitled to vote in such election who shall be present at such meeting, either in person or by proxy, shall constitute a quorum for such meeting, notwithstanding any provision of the

---

[147] *See also* Def.'s Post-Trial Reply Br. 3−4.

certificate of incorporation or the bylaws of the corporation to the contrary.[148]

With more than two decades of documented familial strife over RMI and the Property, the court has no confidence that the members will be able to proceed on their own from this decision to conduct a meeting of the members to elect a Board. Therefore, in accordance with Section 215 and this court's broad equitable powers in fashioning relief, the court orders that RMI hold an annual meeting of its members to elect the members of the Board. In addition, pursuant to Section 227(b) of the DGCL, the court will appoint a Magistrate in Chancery to conduct the election. *See Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 82 (Del. Ch. 2008) (ordering a prompt special meeting of stockholders to elect directors under the supervision of a special master because it was the "remedy that best vindicate[d] the interests" of the stockholders in a Section 225 action). In that regard, the Magistrate shall have the authority to set a record date and determine and recommend to the court a list of Regular members of RMI who may vote at the meeting of members. The only business to be conducted at the meeting shall be the election of directors. Therefore, the court appoints Magistrate Christian Douglas Wright to ascertain and recommend to the court the Regular members of RMI eligible to vote at the court-ordered meeting, to oversee the meeting, and to make any recommendation within his

---

[148] 8 *Del. C.* § 215(d).

authority pursuant to Section 215 of the DGCL. In the interim, the status quo shall be maintained, and no person or persons purporting to act as the Board of RMI shall take any action outside the ordinary course pending the election and seating of the Board as required herein. For avoidance of doubt, this shall include, without limitation, amending the Bylaws or Certificate, effecting a sale of any assets of the Company, or attempting to dissolve the Company.[149]

## III. CONCLUSION

For the foregoing reasons, the Written Consent validly removed and replaced the March Board of RMI, effective June 28, 2017. The Written Consent did not amend the RMI Certificate in any manner. None of the purported actions taken at the July 3 Special Meeting is valid, including, without limitation, the termination of Terry as a member and officer of RMI. A special meeting of members of RMI to elect directors shall be conducted under the supervision of Magistrate Wright, pursuant to the terms of a forthcoming order implementing this opinion.

---

[149] Given the court's decision requiring a meeting of the members to elect the Board, there is no utility in deciding issues that are not within the scope of this Section 225 proceeding, which the newly elected Board of RMI can address. Specifically, the court declines to decide whether: (1) Terry has a right to a license to live on the Property; (2) Terry owes RMI dues, taxes, and expenses for having freeloaded for more than a decade; (3) Terry is entitled to reimbursement for litigation expenses in prior actions; and (4) RMI is a charitable nonstock corporation.